1  this analysis, the authors found that for sustained periods in 2006 and 2007, the empirical

2  standard-deviation distribution differed significantly from the Benford reference distribution for

3  nearly all banks submitting quotes. The authors also observed large deviations from Benford for

4  a sustained period in 2008.

5      125.    Those studies indicate at least a possibility that Defendants' suppression of LIBOR

6  goes back even farther than August 2007.

7      **E.    That At Least Some Defendants Faced Dire Financial Circumstances During the Relevant Period Further Renders Their Unduly Low LIBOR Quotes**

8          **Striking.**

9      126.    The independent economic analyses performed in connection with the LIBOR

10  MDL Proceedings, whose findings are corroborated by the publicly available scholarly work

11  detailed above, strongly indicate Defendants' LIBOR quotes during the Relevant Period did not

12  appropriately reflect those banks' actual borrowing costs at that time—and, indeed, that

13  Defendants collectively suppressed LIBOR. Further illustrating the striking discrepancy between

14  Defendants' submissions to the BBA and their actual borrowing costs, during 2008 and 2009 at

15  least some of those banks' LIBOR quotes were too low in light of the dire financial circumstances

16  the banks faced, which were described in numerous news articles from the Relevant Period.

17      **1.    Citibank**

18      127.    On November 21, 2008, *The Wall Street Journal* reported that Citigroup

19  executives "began weighing the possibility of auctioning off pieces of the financial giant or even

20  selling the company outright" after the company faced a plunging stock price. The article noted

21  Citigroup executives and directors "rushing to bolster the confidence of investors, clients and

22  employees" in response to uncertainty about Citigroup's exposure to risk concerning mortgage-

23  related holdings.[44] Similarly, on November 24, 2008, *CNNMoney* observed:

24          If you combine opaque structured-finance products with current

25          fair-value accounting rules, almost none of the big banks are solvent because that system equates solvency with asset liquidity.

26          So at this moment Citi isn't solvent. Some argue that liquidity, not solvency, is the problem. But in the end it doesn't matter. Fear

27          will drive illiquidity to such a point that Citi could be rendered

28  [44] *See* http://online.wsj.com/article/SB122722907151946371.html?mod=testMod.

insolvent under the current fair-value accounting system.[45]

128.    On January 20, 2009, Bloomberg reported that Citigroup "posted an \$8.29 billion fourth-quarter loss, completing its worst year, and plans to split in two under Chief Executive Officer Vikram Pandit's plan to rebuild a capital base eroded by the credit crisis. The article further stated, "The problems of Citi, Bank of America and others suggest the system is bankrupt." (Emphasis added).[46]

### 2.    RBS, Lloyds, and HBOS

129.    An April 23, 2008 analyst report from Société Générale reported, with respect to RBS's financial condition in the midst of its attempt to raise capital:

> Given the magnitude and change in direction in a mere eight weeks, we believe that management credibility has been tarnished. We also remain unconvinced that the capital being raised is in support of growth rather than merely to rebase and recapitalise a bank that overstretched itself at the wrong point in the cycle in its pursuit of an overpriced asset.
>
> *          *          *
>
> [I]n our eyes, RBS has not presented a rock solid business case that warrants investor support and the bank has left itself almost no capital headroom to support further material deterioration in either its assets or its major operating environments. We believe £16bn (7% core tier I ratio) would have provided a solid capital buffer.

The analysts also opined, "[W]e are not of the belief that all of RBS'[s] problems are convincingly behind it." They further explained, "When faced with the facts and the events leading up to yesterday's request for a £12bn capital injection, we believe shareholders are being asked to invest further in order to address an expensive mishap in H2 07 rather than capitalise on growth opportunities."

130.    On October 14, 2008, *Herald Scotland* reported a £37 billion injection of state capital into three leading banks, including RBS and HBOS. The article observed, "Without such near-nationalisations, . . . Royal Bank of Scotland and HBOS, would almost certainly have

---

[45] *See* http://money.cnn.com/2008/11/21/news/companies/benner_citi.fortune/.

[46] *See* http://www.bloomberg.com/apps/news?pid=21070001&sid=aS0yBnMR3USk.

1      suffered a run on their remaining reserves and been plunged into insolvency. Their share prices

2      could scarcely have taken much more of their recent hammering."[47]

3          131.    On December 12, 2008, Bloomberg reported that shareholders approved HBOS's

4      takeover by Lloyds TSB Group plc following bad-loan charges in 2008 rising to £5 billion and an

5      increase in corporate delinquencies. The article also quoted analysts characterizing HBOS's loan

6      portfolio as "'generally of a lower quality than its peers.'" Bloomberg further observed that

7      HBOS suffered substantial losses on its bond investments, which totaled £2.2 billion, and losses

8      on investments increased from £100 million to £800 million for the year.[48]

9          132.    A January 20, 2009 analyst report from Société Générale stated:

10                 We would note that given the 67% drop in the share price following
                   [RBS]'s announcements yesterday [relating to capital restructuring
11                 due to greater-than-expected credit-market related write downs and
                   bad debt impairments in Q4], the loss of confidence in the bank's
12                 ability to continue to operate as a private sector player and concern
                   over the potential ineffectiveness of the Asset Protection Scheme
13                 may prompt the UK government to fully nationalise the bank. In
                   this instance, the shares could have very limited value, if at all.[49]
14

15          133.    On March 9, 2009, Bloomberg reported that Lloyds "will cede control to the

16      British Government in return for state guarantees covering £260 billion ($572 billion of risky

17      assets)." The article further observed that in September 2008, Lloyds agreed to buy HBOS for

18      roughly £7.5 billion as the British Government sought to prevent HBOS from collapsing after

19      credit markets froze. The HBOS loan book was described as "more toxic than anyone ever

20      dreamed."[50]

21          134.    On November 24, 2009, Bloomberg reported that the Bank of England provided

22      £62 billion ($102 billion) of "taxpayer-backed emergency financing" to RBS and HBOS at the

23      height of the financial crisis in October 2008 and that "[t]he [financing] operations were kept

24

25    [47] *See* http://www.heraldscotland.com/reckless-banks-brought-this-financial-firestorm-down-upon-their-own-heads-1.891981.

26    [48] *See* http://www.bloomberg.com/apps/news?pid=newsarchive&sid=a4BTqdgwhPTc&refer=uk.

27    [49] *See* January 20, 2009 Société Générale analyst report on Royal Bank of Scotland titled "Little value left for sharcholders."

28    [50] *See* http://www.businessday.com.au/business/lloyds-the-latest-uk-bank-to-be-rescued-20090308-8sfd.html.

1  secret until now to prevent unnerving markets." The Bank's Deputy Governor Paul Tucker was

2  quoted as stating in evidence to the Treasury Committee in London that "'[h]ad we not done it,

3  the cycle would have been a lot worse…[and that] [t]his was tough stuff, a classic lender of last

4  resort operation.'"[51]

### 3.   WestLB

6  135.   A September 9, 2008 article in *Spiegel Online* reported WestLB was "heavily hit

7  as a result of the US sub-prime crisis and the resulting credit crunch. Ill-advised speculation

8  resulted in a 2007 loss of €1.6 billion—leading the bank to the very brink of insolvency." The

9  article reported that in early 2008, a special investment vehicle was set by WestLB's primary

10  shareholders to "guarantee €5 billion worth of risky investments." The European Commissioner

11  approved the public guarantee but demanded that the bank be "completely restructured to avoid

12  failing afoul of competition regulations." The European Commissioner for Competition later

13  warned that if WestLB did not significantly improve its restructuring package, Brussels would not

14  approve the public assistance that European Union had already provided to the bank. Further, if

15  that occurred, WestLB would have to pay back €12 billion to the EU.[52]

16  136.   On November 24, 2009, Bloomberg reported that BNP Paribas SA said

17  "[i]nvestors should buy the euro [ ] on speculation that capital will need to be repatriated to

18  support German bank WestLB AG." Furthermore, two German regional savings bank groups that

19  hold a majority stake in WestLB were "prepared to let the Dusseldorf-based lender become

20  insolvent" and that "the prospect of insolvency may force state-owned banks and savings banks

21  outside North Rhine-Westphalia, WestLB's home state, to contribute to capital injections."

22  Moreover, Bloomberg reported, WestLB needed "as much as 5 billion euros ($7.5 billion) in

23  capital and may be shut by Nov. 30 unless a solution for its capital needs can be found."[53]

---

[51] *See* http://www.bloomberg.com/apps/news?pid=21070001&sid=a9MjQj6MNTeA.

[52] *See* Anne Seith, Germany's WestLB under Attack from Brussels, *Spiegel Online*, Sept. 9, 2008, available at http://www.spiegel.de/international/business/0,1518,druck-577142,00.html.

[53] *See* Matthew Brown, BNP Says Buy Euro on Speculation WestLB to Be Rescued, Bloomberg, Nov. 24, 2009, available at http://www.bloomberg.com/apps/news?pid=21070001&sid=al9ZPZShrjWl.

1094456.1                           - 57 -

**F.    Defendants' Improper Activities Are the Focus of Government Investigations, Legal Proceedings, and Disciplinary Actions Worldwide.**

137.    As detailed below, investigations regarding LIBOR are ongoing in the United States, the United Kingdom, Switzerland, Japan, Canada, the European Union, and Singapore by numerous government agencies, including the DOJ, the SEC, and the CFTC.

138.    Indeed, on February 27, 2012, the DOJ represented to the Court overseeing the LIBOR MDL Proceedings that the Justice Department "is conducting a criminal investigation into alleged manipulation of certain benchmark interest rates, including LIBORs of several currencies." The investigation consists of a joint effort by the DOJ's criminal and antitrust divisions.

139.    Authorities are attempting to determine, among other things, "whether banks whose funding costs were rising as the financial crisis intensified tried to mask that trend by submitting artificially low readings of their daily borrowing costs."[54] Though the proceedings are ongoing, several Defendants have admitted that government entities—including the DOJ, the SEC, and the CFTC—have targeted them in seeking information about potential misconduct.

140.    Moreover, documents submitted in connection with legal proceedings in Canada, Singapore, and Japan reveal that at least certain Defendants underreported their borrowing costs to artificially suppress Yen-LIBOR.

**1.    News reports and Defendants' regulatory filings indicate U.S. government and foreign regulatory bodies are engaged in expansive investigations of possible LIBOR manipulation.**

141.    The first public revelation regarding government investigations into possible LIBOR manipulation occurred on March 15, 2011, when UBS disclosed in a Form 20-F (annual report) filed with the SEC that the bank had "received subpoenas" from the SEC, the CFTC, and the DOJ "in connection with investigations regarding submissions to the [BBA]." UBS stated it understood "that the investigations focus on whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate LIBOR rates at certain times." The bank further disclosed that it had "received an order to provide information to the Japan Financial

---

[54] Enrich, Mollenkamp, & Eaglesham, "U.S. Libor Probe Includes BofA, Citi, UBS."

1   Supervisory Agency concerning similar matters." UBS stated it was "conducting an internal

2   review" and was "cooperating with the investigations."

3   142.   On March 16, 2011, the *Financial Times* reported that UBS, BAC, Citigroup, and

4   Barclays received subpoenas from U.S. regulators "probing the setting of" USD-LIBOR

5   "between 2006 and 2008." The *Times* further noted investigators had "demanded information

6   from" WestLB, and that the previous fall, "all 16 members of the committee that helped the

7   [BBA] set the dollar Libor rate during 2006-08 received informal requests for information."[55]

8   143.   The same day, *MarketWatch* similarly reported "[m]ultiple U.S. and European

9   banks, which provide borrowing costs to calculate Libor every day, have been contacted by

10  investigators," including the DOJ, the SEC, and the CFTC.[56]

11  144.   The next day, Bloomberg reported that Barclays and Citigroup had received

12  subpoenas from U.S. regulators and that Defendants WestLB, Lloyds, and BAC had been

13  contacted by regulators. The article specified BAC had received subpoenas from the SEC and the

14  DOJ.[57]

15  145.   On March 23, 2011, Bloomberg revealed that Citigroup Inc., Deutsche Bank,

16  BAC, and JPMorgan Chase were asked by U.S. regulators "to make employees available to

17  testify as witnesses" in connection with the regulators' ongoing investigation.[58]

18  146.   The next day, the *Financial Times* reported that Defendant Barclays was

19  "emerging as a key focus of the US and UK regulatory probe into alleged rigging of [LIBOR]."

20  According to the *Times*, investigators were "probing whether communications between the bank's

21  traders and its treasury arm," which helps set LIBOR, "violated 'Chinese wall' rules that prevent

22  information-sharing between different parts of the bank." The *Times* further stated investigators

23

24  [55] Brooke Masters, Patrick Jenkins & Justin Baer, "Banks served subpoenas in Libor case," FT.com, available at http://www.ft.com/cms/s/0/52958d66-501f-11e0-9ad1-00144feab49a.html#axzz1sJNEDIiI.

25  [56] Carrick Mollenkamp and David Enrich, "Banks Probed in Libor Manipulation Case," *MarketWatch*, Mar. 16, 2011.

26

27  [57] Gavin Finch and Jon Menon, "Barclays, Citigroup Said to Be Subpoenaed in Libor Probe," Bloomberg, Mar. 17, 2011.

28  [58] Joshua Gallu and Donal Griffin, "Libor Probe Spurs Witness Call-up at Citigroup, Deutsche Bank," Bloomberg, Mar. 23, 2011.

1094456.1                                    - 59 -

1     were "said to be looking at whether there was any improper influence on Barclays' submissions"

2     during 2006-2008 for the BBA's daily survey used to set LIBOR.[59]

3     147.     Additional information regarding the regulatory probes emerged during the next

4     few months, including revelations about other banks' possible—or actual—misconduct.

5     148.     In an "Interim Management Statement" filed on April 27, 2011, for example,

6     Barclays stated it was "cooperating with" the investigations by the UK Financial Services

7     Authority, the CFTC, the SEC, and the DOJ "relating to certain past submissions made by

8     Barclays to the [BBA], which sets LIBOR rates."

9     149.     RBS similarly disclosed, in a Form 6-K filed with the SEC on May 6, 2011, the

10     bank was "co-operating with" the investigations being conducted by the CFTC, the SEC, and the

11     European Commission "into the submission of various LIBOR rates by relevant panel banks."

12     150.     Soon after, on May 16, 2011, Lloyds disclosed that it too "had received requests

13     for information as part of the Libor investigation and that it was co-operating with regulators,

14     including the [CFTC] and the European Commission."[60] Britain's *Daily Telegraph* further

15     reported that Defendant HBOS, which merged with Lloyds TSB in January 2009 to form Lloyds

16     Banking Group, "was the main target given its near collapse in late 2008 as it lost access to

17     wholesale funding markets."

18     151.     On May 23, 2011, the *Telegraph* reported that the Federal Bureau of Investigation

19     ("FBI") was working with regulators in connection with the LIBOR investigations, and the FBI's

20     British counterpart, the Serious Fraud Office, "revealed it is also taking an active interest."

21     152.     In a Form 6-K filed with the SEC on July 26, 2011, UBS disclosed that it had

22     "been granted conditional leniency or conditional immunity from authorities in certain

23     jurisdictions, including the Antitrust Division of the DOJ, in connection with potential antitrust or

24     competition law violations related to submissions for Yen LIBOR and Euroyen TIBOR (Tokyo

25     Interbank Offered Rate)." Accordingly, the company continued, it would "not be subject to

26

---

[59] Brooke Masters and Megan Murphy, "Barclays at centre of Libor inquiry," FT.com, Mar. 24, 2011,
27     available at http://www.ft.com/intl/cms/s/0/1c3228f6-5646-11e0-82aa-
00144feab49a.html#axzz1sJNEDIil.

28     [60] Harry Wilson, "Lloyds Banking Group in Libor investigation," *The Daily Telegraph*, May 17, 2011.

1    prosecutions, fines or other sanctions for antitrust or competition law violations in connection

2    with the matters [UBS] reported to those authorities, subject to [UBS's] continuing cooperation."

3    The conditional leniency UBS received derives from the Antitrust Criminal Penalties

4    Enhancement and Reform Act and the DOJ's Corporate Leniency Policy, under which the DOJ

5    only grants leniency to corporations reporting actual illegal activity.  UBS later disclosed (on

6    February 7, 2012) that the Swiss Competition Commission had granted the bank conditional

7    immunity regarding submissions for Yen-LIBOR, TIBOR, and Swiss-franc LIBOR.

8         153.    Similar to the other Defendants discussed above, HSBC, in an interim report filed

9    on August 1, 2011, disclosed that it and/or its subsidiaries had "received requests" from various

10   regulators to provide information and were "cooperating with their enquiries."

11        154.    On or about the same day, Barclays—which several months earlier had referenced

12   its "cooperation" with government entities investigating potential misconduct relating to

13   LIBOR—specified the investigations involved "submissions made by Barclays" and other

14   LIBOR panel members.  Barclays further stated it was engaged in discussions with those

15   authorities about potential resolution of these matters before proceedings are brought against the

16   bank.

17        155.    On September 7, 2011, the *Financial Times* reported that as part of their LIBOR

18   investigation, the DOJ and the CFTC—in assessing whether banks violated the Commodity

19   Exchange Act, which can result in criminal liability—were examining "whether traders placed

20   bets on future yen and dollar rates and colluded with bank treasury departments, who help set the

21   Libor index, to move the rates in their direction," as well as "whether some banks lowballed their

22   Libor submissions to make themselves appear stronger."[61]

23        156.    On October 19, 2011, *The Wall Street Journal* reported that the European

24   Commission "seized documents from several major banks" the previous day, "marking the

25   escalation of a worldwide law-enforcement probe" regarding the Euro Interbank Offered Rate, or

26   Euribor—a benchmark, set by more than 40 banks, used to determine interest rates on trillions of

27

28   [61] Brooke Masters and Kara Scannell, "Libor inquiry looks at criminal angle," FT.com, Sept. 7, 2011,
     available at http://www.ft.com/cms/s/0/c8ed4248-d962-11e0-b52f-00144feabdc0.html#axzz1sRxAdyPS.

     1094456.1                                    - 61 -

1    euros' worth of euro-denominated loans and debt instruments. The Euribor inquiry, the *Journal*
2    explained, constitutes "an offshoot" of the broader LIBOR investigation that had been ongoing
3    for more than a year. According to the *Journal*, while the list of financial firms raided by the
4    European Commission was not available, people familiar with the situation had counted "a large
5    French bank and a large German bank" among the targets, and the coordinated raids "occurred in
6    London and other European cities."

7    157.    On October 31, 2011, the *Financial News* observed that "[a]n investigation into
8    price fixing, first ordered by the [SEC] in 2008, focused on whether banks, including UBS,
9    Citigroup, and Bank of America, had been quoting deliberately low rates."[62]

10   158.    On December 9, 2011, *Law360* reported that the Japanese Securities and Exchange
11   Surveillance Commission ("SESC") alleged that Citigroup Global Markets Japan Inc. and UBS
12   Securities Japan Ltd. "employed staffers who attempted to influence" TIBOR "to gain advantage
13   on derivative trades." The SESC recommended that the Japanese prime minister and the head of
14   Japan's Financial Services Agency ("JFSA") take action against the companies. The Commission
15   specified that Citigroup's head of G-10 rates and a Citigroup trader, as well as a UBS trader, were
16   involved in the misconduct, further stating, "[t]he actions of Director A and Trader B are
17   acknowledged to be seriously unjust and malicious, and could undermine the fairness of the
18   markets." Moreover, the Commission added, "[i]n spite of recognizing these actions, the
19   president and CEO . . . who was also responsible for the G-10 rates, overlooked these actions and
20   the company did not take appropriate measures, therefore, the company's internal control system
21   is acknowledged to have a serious problem."[63] *Law360* reported that the SESC released "a
22   similar statement" about UBS's alleged conduct.

23   159.    Citigroup and UBS did not deny the SESC's findings. A Citigroup spokesperson
24   stated, "Citigroup Global Markets Japan takes the matter very seriously and sincerely apologizes
25   to clients and all parties concerned for the issues that led to the recommendation. The company
26   has started working diligently to address the issues raised." A UBS spokesperson similarly stated

27   _____

     [62] Tom Osborn, "Is Libor in its death throes?", *Financial News*, Oct. 31, 2011.

28   [63] Juan Carlos Rodriguez, "Japan Accuses Citi, UBS Of Market Trickery," *Law360*, Dec. 9, 2011.

     1094456.1                                    - 62 -

the bank was taking the findings "very seriously" and had been "working closely with" the SESC and the JFSA "to ensure all issues are fully addressed and resolved." She added, "We have taken appropriate personnel action against the employee involved in the conduct at issue."

160.   Citigroup later disclosed that on December 16, 2011, the JFSA took administrative action against Citigroup Global Markets Japan, Inc. ("CGMJ") for, among other things, certain communications made by two CGMJ traders about Euroyen TIBOR. The JFSA issued a business improvement order and suspended CGMJ's trading in derivatives related to Yen-LIBOR, as well as Euroyen and Yen-TIBOR from January 10 to January 23, 2012. On the same day, the JFSA also took administrative action against Citibank Japan Ltd. for conduct arising out of Citibank Japan's retail business and also noted that the communications made by the CGMJ traders to employees of Citibank Japan about Euroyen TIBOR had not been properly reported to Citibank Japan's management team.

161.   UBS likewise revealed further details regarding the Japanese regulators' findings and the resulting disciplinary action. Specifically, the bank announced that on December 16, 2011, the JFSA commenced an administrative action against UBS Securities Japan Ltd. ("UBS Securities Japan") based on findings by the SESC that:

> (i) a trader of UBS Securities Japan engaged in inappropriate conduct relating to Euroyen TIBOR and Yen LIBOR, including approaching UBS AG, Tokyo Branch, and other banks to ask them to submit TIBOR rates taking into account requests from the trader for the purpose of benefiting trading positions; and (ii) serious problems in the internal controls of UBS Securities Japan resulted in its failure to detect this conduct.

Based on those findings, the JFSA "issued a Business Suspension Order requiring UBS Securities Japan to suspend trading in derivatives transactions related to Yen LIBOR and Euroyen TIBOR" from January 10 to January 16, 2012 (excluding transactions required to perform existing contracts). The JFSA also issued a "Business Improvement Order" requiring UBS Securities Japan to enhance "compliance with its legal and regulatory obligations" and to establish a "control framework" designed to prevent similar improper conduct.

162.   *The Wall Street Journal* has since cited people familiar with the UBS matter as identifying the trader as Thomas Hayes, who joined UBS Securities Japan in 2006 "and traded

1  products linked to the pricing of short-term yen-denominated borrowings"; he worked at UBS for

2  about three years.[64]

3  163.   In the same article, the *Journal* more broadly reported that investigators in the U.S.

4  and foreign LIBOR probes "are focusing on a small number of traders suspected of trying to

5  influence other bank employees to manipulate the rates."

6  164.   Other news accounts have confirmed—based at least in part on information from

7  people familiar with the ongoing investigations—that investigators are examining potential

8  improper collusion by traders and bankers to manipulate LIBOR or other rates. On February 3,

9  2012, for instance, Credit Suisse disclosed that the Swiss Competition Commission commenced

10 an investigation involving twelve banks and certain other financial intermediaries, including

11 Credit Suisse, concerning alleged collusive behavior among traders to affect the bid ask spread

12 for derivatives tied to the LIBOR and TIBOR reference rates fixed with respect to certain

13 currencies, and collusive agreements to influence these rates.

14 165.   Additionally, on February 14, 2012, Bloomberg reported that two people with

15 knowledge of the ongoing LIBOR probe said global regulators "have exposed flaws in banks'

16 internal controls that may have allowed traders to manipulate interest rates around the world."

17 The same people, who were not identified by name (as they were not authorized to speak publicly

18 about those matters), stated investigators also had "received e-mail evidence of potential

19 collusion" between firms setting LIBOR. Those sources further noted Britain's FSA was

20 "probing whether banks' proprietary-trading desks exploited information they had about the

21 direction of Libor to trade interest-rate derivatives, potentially defrauding their firms'

22 counterparties."[65]

23 166.   Bloomberg further reported that RBS had "dismissed at least four employees in

24 connection with the probes," and Citigroup and Deutsche Bank "also have dismissed, put on

25 leave or suspended traders as part of the investigations."

26

27 [64] Jean Eaglesham, Atsuko Fukase, & Sam Holmes, "Rate Probe Keys On Traders: Investigators Suspect Employees at Some Banks Tried to Manipulate Rates," *The Wall Street Journal*, Feb. 7, 2012.

28 [65] Lindsay Fortado and Joshua Gallu, "Libor Probe Said to Expose Collusion, Lack of Internal Controls," Bloomberg, Feb. 14, 2012.

1094456.1                                                - 64 -

1    167.    Bloomberg also reported that European Union antitrust regulators are also

2    investigating whether banks effectively formed a global cartel and coordinated how to report

3    borrowing costs between 2006 and 2008.

4    168.    In March 2012, the Monetary Authority of Singapore disclosed that it has been

5    approached by regulators in other countries to help in investigations over the possible

6    manipulation of interbank interest rates.[66]

7    169.    According to the *Daily Mail*, investigations by the SEC, the FSA, the Swiss

8    Competition Commission, and regulators in Japan focus on three concerns: First, whether banks

9    artificially suppressed LIBOR during the financial crisis, making banks appear more secure than

10   they actually were; second, whether bankers setting LIBOR leaked their data to traders before

11   officially submitting the banks' LIBOR quotes to the BBA; and third, whether traders at the

12   banks, and at other organizations (such as hedge funds), may have tried to influence LIBOR by

13   making suggestions or demands on the bankers providing LIBOR quotes.

14                  **2.     Evidence disclosed to date in proceedings in Canada and Singapore**
                    **confirms that certain Defendants conspired to manipulate Yen-**
15                  **LIBOR.**

16   170.    Documents submitted in pending legal proceedings in Canada and Singapore

17   strongly indicate some Defendants manipulated Yen-LIBOR, the Yen-based rate set by a 15-

18   member BBA panel that, during the Relevant Period consisted of (and still consists of) many of

19   the same banks whose borrowing-cost quotes determine USD-LIBOR, including Barclays,

20   Citibank, Deutsche Bank, HSBC, JPMorgan Chase, Lloyds, RBS, and UBS.  The facts (some

21   provided by Defendants themselves) demonstrating Defendants' misconduct with respect to Yen-

22   LIBOR illustrate both their desire and ability to manipulate interest rates, and the method by

23   which they have done so.

24                          **a.     Canadian Proceedings**

25   171.    In the Canadian action, Brian Elliott, a Competition Law Officer in the Criminal

26   Matters Branch of the Competition Bureau, submitted an affidavit in May 2011 (the "May 2011

27   Elliott Affidavit") in support of "an Ex Parte Application for Orders to Produce Records Pursuant

28   ────────────────
     [66] *Business Times*, Mar. 9, 2012.

     1094456.1                          - 65 -

1    to Section 11 of the Competition Act and for Sealing Orders" in the Court of Ontario, Superior

2    Court of Justice, East Region. Specifically, the May 2011 Elliott Affidavit sought orders

3    requiring HSBC Bank Canada, Royal Bank of Scotland N.V., Canada Branch, Deutsche Bank,

4    J.P. Morgan Bank Canada, and Citibank Canada (referenced collectively in the Affidavit as the

5    "Participant Banks") to produce documents in connection with an inquiry concerning whether

6    those banks conspired to "enhance unreasonably the price of interest rate derivatives from 2007 to

7    March 11, 2010; to prevent or lessen, unduly, competition in the purchase, sale or supply of

8    interest derivatives from 2007 to March 11, 2010; to restrain or injure competition unduly from

9    2007 to March 11, 2010; and to fix, maintain, increase or control the price for the supply of

10    interest rate derivatives from March 12, 2010 to June 25, 2010."

11        172.    The May 2011 Elliott Affidavit further states the Competition Bureau "became

12    aware of this matter" after one of the banks (referenced in the affidavit as the "Cooperating

13    Party") "approached the Bureau pursuant to the Immunity Program" and, in connection with that

14    bank's application for immunity, its counsel "orally proffered information on the Alleged

15    Offences" to officers of the Competition Bureau on numerous occasions in April and May 2011.

16    Furthermore, according to the Affidavit, counsel for the Cooperating Party "stated that they have

17    conducted an internal investigation of the Cooperating Party that included interviews of

18    employees of the Cooperating Party who had knowledge of or participated in the conduct in

19    question, as well as a review of relevant internal documents." The Affidavit also notes that on

20    May 17, 2011, counsel for the Cooperating Party provided the Competition Bureau with

21    "electronic records," which Elliot "believe[s] to be records of some of the communications

22    involving the Cooperating Party that were read out as part of the orally proffered information by

23    counsel for the Cooperating Party."

24        173.    The Affidavit recounted that, the Cooperating Party's counsel, during the relevant

25    period the Participant Banks—at times "facilitated" by "Cash Brokers"—"entered into

26    agreements to submit artificially high or artificially low London Inter-Bank Offered Rate

27    ('LIBOR') submissions in order to impact the Yen LIBOR interest rates published by the

28    [BBA]." Those entities engaged in that misconduct to "adjust[] the prices of financial

1094456.1                    - 66 -

1    instruments that use Yen LIBOR rates as a basis." The Affidavit further states the Cooperating

2    Party's counsel "indicated the Participant Banks submitted rates consistent with the agreements

3    and were able to move Yen LIBOR rates to the overall net benefit of the Participants."

4          174.    More specifically, counsel proffered that during the relevant period, the Participant

5    Banks "communicated with each other and through the Cash Brokers to form agreements to fix

6    the setting of Yen LIBOR," which "was done for the purpose of benefiting trading positions, held

7    by the Participant Banks, on IRDs [interest rate derivatives]." By manipulating Yen LIBOR, the

8    Affidavit continues, "the Participant Banks affected all IRDs that use Yen LIBOR as a basis for

9    their price." The misconduct was carried out "through e-mails and Bloomberg instant messages

10   between IRD traders at the Participant Banks and employees of Cash Brokers (who had influence

11   in the setting of Yen LIBOR rates)." The Affidavit details:

12              IRD traders at the Participant Banks communicated with each other
                their desire to see a higher or lower Yen LIBOR to aid their trading
13              position(s). These requests for changes in Yen LIBOR were often
                initiated by one trader and subsequently acknowledged by the trader
14              to whom the communication was sent. The information provided
                by counsel for the Cooperating Party showed that the traders at
15              Participant Banks would indicate their intention to, or that they had
                already done so, communicate internally to their colleagues who
16              were involved in submitting rates for Yen LIBOR. The traders
                would then communicate to each other confirming that the agreed
17              up rates were submitted. However, not all attempts to affect
                LIBOR submissions were successful.
18
                The Cash Brokers were asked by IRD traders at the Participant
19              Banks to use their influence with Yen LIBOR submitters to affect
                what rates were submitted by other Yen LIBOR panel banks,
20              including the Participant Banks.

21         175.    The Affidavit indicates the Cooperating Party's counsel further proffered that at

22   least one of the Cooperating Party's IRD traders ("Trader A" or "Trader B") communicated with

23   an IRD trader at HSBC, Deutsche Bank, RBS, JPMorgan (two traders), and Citibank. In that

24   regard, the Affidavit specifies:

25              Trader A communicated his trading positions, his desire for a
                certain movement in Yen LIBOR and instructions for the HSBC
26              trader to get HSBC to make Yen LIBOR submissions consistent
                with his wishes. Attempts through the HSBC trader to influence
27              Yen LIBOR were not always successful. Trader A also
                communicated his desire for a certain movement in the Yen LIBOR
28              rate with the Cash Brokers. He instructed them to influence the

     1094456.1                              - 67 -
                                          COMPLAINT

1     Yen LIBOR submitters of HSBC. The Cash Brokers acknowledged
      making these attempts.

2

3     Trader A communicated his trading positions, his desire for certain
      movement in Yen LIBOR and asked for the Deutsche IRD trader's
      assistance to get Deutsche to make Yen LIBOR submissions

4     consistent with his wishes. The Deutsche IRD trader also shared
      his trading positions with Trader A. The Deutsche IRD trader

5     acknowledged these requests. Trader A also aligned his trading
      positions with the Deutsche IRD trader to align their interests in

6     respect of Yen LIBOR. The Deutsche IRD trader communicated
      with Trader A considerably during the period of time, mentioned

7     previously, when Trader A told a Cash Broker of a plan involving
      the Cooperating Party, HSBC and Deutsche to change Yen LIBOR

8     in a staggered and coordinated fashion by the Cooperating Party,
      HSBC and Deutsche. Not all attempts to change the LIBOR rate

9     were successful.

10    Trader A explained to RBS IRD trader who his collusive contacts
      were and how he had and was going to manipulate Yen LIBOR.

11    Trader A also communicated his trading positions, his desire for
      certain movement in Yen LIBOR and gave instructions for the RBS

12    IRD trader to get RBS to make Yen LIBOR submissions consistent
      with Trader A's wishes. The RBS IRD trader acknowledged these

13    communications and confirmed that he would follow through.
      Trader A and the RBS IRD trader also entered into transactions that

14    aligned their trading interest in regards to Yen LIBOR. Trader A
      also communicated to another RBS IRD trader his trading

15    positions, his desire for a certain movement in Yen LIBOR and
      instructions to get RBS to make Yen LIBOR submissions

16    consistent with his wishes. The second RBS IRD trader agreed to
      do this.

17

18    Trader A communicated his trading positions, his desire for a
      certain movement in Yen LIBOR and gave instructions for them

19    [two JPMorgan IRD traders] to get JPMorgan to make Yen LIBOR
      submissions consistent with his wishes. Trader A also asked if the

20    IRD traders at JPMorgan required certain Yen LIBOR submissions
      to aid their trading positions. The JPMorgan IRD traders

21    acknowledged these requests and said that they would act on them.
      On another occasion, one of the JPMorgan IRD traders asked

22    Trader A for a certain Yen LIBOR submission, which Trader A
      agreed to help with. Trader A admitted to an IRD trader at RBS

23    that he colluded with IRD traders at JPMorgan.

24    Trader B of the Cooperating Party communicated with an IRD
      trader at Citi. They discussed their trading positions, advanced

25    knowledge of Yen LIBOR submissions by their banks and others,
      and aligned their trading positions. They also acknowledged efforts

26    to get their banks to submit the rates they wanted.

27

28

1094456.1                          - 68 -

176. On May 18, 2011, the Ontario Superior Court signed the orders directing the production of the records sought by the May 2011 Elliott Affidavit. But to Plaintiffs' knowledge, the Affidavit was not publicly available until February 2012.

177. Elliott submitted another affidavit in June 2011 (the "June 2011 Elliott Affidavit"), which sought an order requiring ICAP Capital Markets (Canada) Inc., believed to be one of the "Cash Brokers" referenced in the May 2011 Elliott Affidavit, to "produce records in the possession of its affiliates, ICAP PLC and ICAP New Zealand Ltd." The June 2011 Elliott Affidavit primarily detailed communications between "Trader A" (an IRD trader) of the previously-referenced "Cooperating Party" and an ICAP broker (referenced in the June 2011 Elliott Affidavit as "Broker X") during the relevant period.

178. The Affidavit specifies that Trader A "discussed his current trading positions with Broker X and where he would like to see various maturities of Yen LIBOR move." Trader A "asked Broker X for Yen LIBOR submissions that were advantageous to Trader A's trading positions," and Broker X, in turn, "acknowledged these requests and advised Trader A about his efforts to make them happen." The Affidavit further states:

> Counsel for the Cooperating Party has proffered that the expectation was for Broker X, directly or through other brokers at ICAP, to influence the Yen LIBOR submissions of Panel Banks. Broker X communicated to Trader A his efforts to get brokers at ICAP in London to influence Yen LIBOR Panel Banks in line with Trader A's requests. The efforts of Broker X included contacting a broker at ICAP in London who issued daily LIBOR expectations to the market. Trader A also communicated to Broker X his dealings with traders at other Participant Banks and a broker at another Cash Broker. Not all efforts to influence Yen LIBOR panel banks were successful. Broker X had additional discussions around the setting of Yen LIBOR with another trader of the Cooperating Party ("Trader B").

179. On June 14, 2011, the Ontario Superior Court issued an order allowing the document requests concerning ICAP.

180. The press has reported that UBS was the "Cooperating Party" referred to in the Elliott Affidavits.

### b. Singapore Action

181.    In addition to UBS's admissions in the Canadian proceedings, in a pending legal action in Singapore's High Court, Tan Chi Min, former head of delta trading for RBS's global banking and markets division in Singapore (who worked for RBS from August 12, 2006 to November 9, 2011), alleges in his Writ of Summons and Statement of Claim that the bank condoned collusion between its traders and LIBOR rate-setters to set LIBOR at levels to maximize profits. In the same filing, Min stated RBS commenced an internal probe following inquiries by European and U.S. authorities about potential LIBOR manipulation.

182.    Min—whom RBS terminated, asserting he engaged in "gross misconduct"— alleges that RBS's internal investigations "were intended to create the impression that such conduct was the conduct not of the defendant itself but the conduct of specific employees who the defendant has sought to make scapegoats through summary dismissals." Min further alleges that it was "part of his responsibilities to provide input and submit requests to the rate setter and there is no regulation, policy, guideline or law that he has infringed in doing this," and that "it was common practice among [RBS]'s senior employees to make requests to [RBS]'s rate setters as to the appropriate LIBOR rate." Those requests, Min specified, "were made by, among others, Neil Danziger, Jezri Mohideen (a senior manager), Robert Brennan (a senior manager), Kevin Liddy (a senior manager) and Jeremy Martin," and the practice "was known to other members of [RBS]'s senior management including Scott Nygaard, Todd Morakis and Lee Knight." Min added that RBS employees "also took requests from clients (such as Brevan Howard) in relation to the fixing of LIBOR."

183.    Indeed, in responding to Min's allegations, RBS admitted he had tried to improperly influence RBS rate-setters from 2007 to 2011 to submit LIBOR rates at levels that would benefit him.

184.    In his complaint, however, Min alleged that he could not have influenced the rate on his own. He also stated it was "common practice" among RBS's senior employees to make requests as to the appropriate LIBOR rate.

**G. Facts Disclosed in Connection with Government Entities' Settlements with Barclays and UBS Further Demonstrate Defendants' Misconduct.**

**1. The DOJ, CFTC, and FSA found that Barclays attempted to, and did, suppress LIBOR during the Relevant Period.**

185. Findings made by the DOJ, CFTC, and FSA in connection with their investigations of Barclays' LIBOR-related misconduct illustrate that during the worldwide "financial crisis period" of August or September 2007 through early 2009, Barclays attempted to, and did, artificially suppress LIBOR to mask its true financial condition.

186. The DOJ stated, "From approximately August 2007 through at least approximately January 2009, Barclays often submitted inaccurate Dollar LIBORs that under-reported its perception of its borrowing costs and its assessment of where its Dollar LIBOR submission should have been."[67] Indeed, Barclays' submission of false LIBOR quotes was directed by "[c]ertain members of management at Barclays, including senior managers in the treasury department and managers of the money markets desk," who "directed that the Barclays Dollar LIBOR submitters contribute rates that were nearer to the expected rates of other Contributor Panel banks rather than submitting the proper, higher LIBORs."[68]

187. The DOJ further observed, "[F]ollowing the direction from certain members of management," Barclays personnel who submitted LIBOR quotes "submitted rates that they believed would be consistent with the submissions of other Dollar LIBOR Contributor Panel banks, or at least, that would not be too far above the expected rates of other members of the Contributor Panel."[69] Specifically, the DOJ found—based on "internal Barclays communications"—for certain time periods, "Barclays management instructed the Barclays Dollar LIBOR submitters not to be an 'outlier' compared to other Contributor Panel banks, even if Barclays contributed the highest rate; Barclays could be 'at the top of the pack' but not too far above the next highest contributor."[70] The DOJ also found that while "certain managers"

---

[67] Barclays DOJ Statement ¶ 36.

[68] *Id.*

[69] *Id.*

[70] *Id.* ¶ 37.

1  believed that, in employing the approach detailed above, "Barclays's submitted rates typically

2  would be in the upper quartile of rates submitted by the Contributor Panel banks and thus

3  excluded from the rates used in the calculation of the LIBOR fix," at other times, "management

4  did not want Barclays to submit a rate higher than other Contributor Panel banks, and instructed

5  the Dollar LIBOR submitters to stay 'within the pack' of other members of the Dollar LIBOR

6  Contributor Panel, and to submit rates 'in line' with the other contributors."[71]

7       188.   The DOJ observed that on several occasions, "e-mail messages and phone

8  conversations involving a Barclays Dollar LIBOR submitter reflected the LIBOR submitter's

9  belief that, due to the pressure from Barclays management, Barclays was submitting its LIBOR

10  contributions lower than the rate at which Barclays was borrowing or could have borrowed funds,

11  and lower than the rate at which Barclays should have been submitting its LIBOR contributions,

12  and thus that submitter believed s/he was contributing a false rate."[72]  The DOJ's findings thus

13  demonstrate Barclays' *knowing misconduct* in submitting false LIBOR quotes to the BBA.

14       189.   In that regard, the CFTC specified, "Barclays knew that accounting for its

15  reputational risk in its determination of LIBOR submissions was not permissible under BBA's

16  definition and criteria."[73]  Barclays' LIBOR submitters and their supervisor nonetheless

17  "understood that they were to follow this directive regardless of market conditions or whether

18  their assessment of Barclays' cost of obtaining unsecured funds dictated their submissions to be

19  otherwise."[74]  In other words, "Barclays' U.S. Dollar LIBOR submitters knew that, by acting

20  upon senior management's instruction . . ., they were making improper U.S. Dollar LIBOR

21  submissions that were management's rates and not the rates that the submitters had determined

22  were the correct rates, *i.e.*, those that reflected Barclays' assessment of its cost of borrowing

23  unsecured funds in the London interbank money market."[75]

24

25  [71] *Id.*

26  [72] *Id.* ¶ 38.

27  [73] Barclays CFTC Order at 20.
   [74] *Id.*

28  [75] *Id.*

1094456.1                                    - 72 -

1    190.    The CFTC further found that the senior Barclays Treasury managers "frequently

2    discussed with the U.S. Dollar LIBOR submitters and their supervisor the specific rates to be

3    submitted, in order to ensure they were in compliance with the directive."[76] During those

4    discussions, "the senior U.S. Dollar LIBOR submitter consistently made clear that they were not

5    setting Barclays' submissions at the rates that reflected Barclays' cost of obtaining unsecured

6    funds."[77] The CFTC observed that those discussions "were memorialized in multiple recorded

7    telephone calls and emails during the more than 18-month financial crisis period."[78]

8    191.    On November 30, 2007, for example, a "senior Barclays Treasury manager" spoke

9    with Barclays' "senior U.S. Dollar LIBOR submitter," who was "seeking guidance on his

10   submissions."[79] During that conversation, the senior Treasury manager "related his

11   understanding that senior management had discussed the issue and directed them to continue to

12   'stick within the bounds[,] so no head above [the] parapet.'"[80] The Treasury manager also told

13   the LIBOR submitter "that they would have to deal with the settings, meaning how to make

14   LIBOR submissions per this directive, on 'a day-to-day-basis.'"[81]

15   192.    The CFTC further recounted that in early December 2007, Barclays' senior U.S.

16   Dollar LIBOR submitter "emailed his supervisor stating that he submitted Barclays' one month

17   LIBOR at 5.30 percent, which was four basis points over the next highest submission and almost

18   five basis points over the LIBOR fixing" but "was well below the 5.40 percent that Barclays was

19   paying (*i.e.*, asking) to borrow funds in the market, and that 'given a free hand [he] would have

20   set around 5.45%.'"[82] The submitter continued, "'My worry is that we (both Barclays and the

21   contributor bank panel) are being seen to be contributing patently false rates. We are therefore

22

23   _____

24   [76] *Id.*
     [77] *Id.*

25   [78] *Id.*

26   [79] *Id.* at 21.
     [80] *Id.* (alterations in original).

27   [81] *Id.*

28   [82] *Id.* at 22 (alteration in original).

     1094456.1                              - 73 -

1    being dishonest by definition and are at risk of damaging our reputation in the market and with

2    the regulators.'"[83]

3        193.    The CFTC found that Barclays' misconduct in knowingly submitting false LIBOR

4    quotes stemmed from its desire "to protect [its] reputation against what it believed were negative

5    and unfair media and market perceptions that Barclays had a liquidity problem based in part on its

6    high LIBOR submissions."[84]

7        194.    The DOJ similarly observed that Barclays' improper submissions "began in

8    approximately late August 2007," shortly after Barclays "twice drew on the Bank of England's

9    emergency liquidity facility (known as the 'window'), borrowing approximately £1.6 billion the

10   second time."[85]    The DOJ further explained:

11           News articles about the withdrawals in late August 2007 noted a
             decline in Barclays's share price and questioned Barclays's
12           liquidity position, while Barclays explained publicly that the visits
             to the window were due to technical glitches. Meanwhile, because
13           of the onset of the financial crisis, there was diminished liquidity in
             funding markets, and Barclays set certain of its LIBOR submissions
14           relatively high compared to other Contributor Panel banks. In early
             September 2007, Barclays received negative press coverage
15           concerning Barclays's high LIBOR submissions in Sterling, Euro,
             and Dollar. A news article questioned Barclays's liquidity position,
16           in light of Barclays's high LIBOR submissions and its visits to the
             Bank of England's window, and noted that Barclays's share price
17           had fallen.[86]

18       195.    Senior managers at Barclays "expressed concern about the negative publicity."[87]

19   Managers on Barclays' money-markets desk and in its Treasury department "who gave the

20   instruction to submit lower LIBORs, which resulted in improperly low LIBOR submissions,"

21   aimed "to avoid inaccurate, negative attention about Barclays's financial health as a result of its

22   high LIBOR submissions relative to other banks."[88]    They "wanted to prevent any adverse

23   conclusions about Barclays's borrowing costs, and more generally, its financial condition,

24   _____
     [83] *Id.*
25   [84] *Id.* at 19.
26   [85] Barclays DOJ Statement ¶ 39.
     [86] *Id.*
27   [87] *Id.* ¶ 40.
28   [88] *Id.*

     1094456.1                                    - 74 -

1    because they believed that those conclusions would be mistaken and that other Contributor Panel

2    banks were submitting unrealistically low Dollar LIBORs."[89]

3    196.    Because those managers "sought to avoid what they believed would be an

4    inaccurate perception that Barclays was not in good financial shape when compared to its peers,"

5    Barclays "engaged in this misconduct in order to reduce the reputational risk associated with

6    proper, higher LIBOR submissions."[90] In other words, the DOJ explained—borrowing from

7    Barclays employees' comments in internal communications—"the purpose of the strategy of

8    under-reporting Dollar LIBORs was to keep Barclays's 'head below the parapet' so that it did not

9    get 'shot' off."[91]

10    197.    In that regard, the CFTC found, a Barclays senior compliance officer stated in an

11    internal e-mail to several levels of Barclays' senior management that he had informed the FSA

12    "that Barclays believed that LIBOR submissions by the panel banks were distorted due to market

13    illiquidity; that Barclays had been consistently the highest or one of the two highest submitters

14    but was concerned to go higher given the negative media reporting about Barclays; that Barclays

15    had concerns about the trillions of dollars of derivatives fixed off LIBOR; and that there were

16    'problematic actions' by some banks."[92] That senior compliance officer did not, however, inform

17    the FSA "that Barclays was making its LIBOR submissions based on considerations of negative

18    market or press perceptions of Barclays or that its LIBOR submitters' assessments of the

19    appropriate rates for submission were being altered to adhere to the directive to be below 'the

20    parapet.'"[93]

21    198.    On another occasion, following an April 16, 2008 *Wall Street Journal* article

22    speculating "that panel member banks were making LIBOR submissions lower than what they

23    were actually paying for funds to prevent the market from concluding that the banks were

24    desperate for cash," a senior Barclays Treasury manager informed the BBA "that [Barclays] had

---

25    [89] *Id.*

26    [90] *Id.* ¶ 40.

27    [91] *Id.*
     [92] Barclays CFTC Order at 22.

28    [93] *Id.*

1094456.1                                    - 75 -

not been reporting accurately," although he further noted "Barclays *was not the worst offender of the panel bank members*."[94]  On that call, the Treasury manager stated, "We're clean, but we're dirty-clean, rather than clean-clean."[95]  The BBA representative responded, "[N]o one's clean-clean."[96]  The CFTC's findings accord with those by the FSA, which observed, "Barclays believed that the submissions of other contributing banks were inappropriate during the financial crisis."[97]

199.     The CFTC Order further specifies, "Senior Barclays Treasury managers provided the submitters with the general guidance that Barclays' submitted rates should be within ten basis points of the submissions by the other U.S. Dollar panel banks to be in compliance with the directive."[98]

200.     Additionally, the DOJ Statement observes that while "the intent of the Barclays managers who gave the instruction and the submitters who contributed improperly low rate submissions in response to the instruction was to influence Barclays's benchmark interest rate submissions" rather than the ultimate LIBOR levels, "[o]n some occasions, . . . the manipulation of Barclays's submissions affected the fixed rates."[99]

201.     The DOJ also recounted Barclays' statements to regulators that other LIBOR Panel Banks were submitting "false and dishonest" quotes to the BBA.

202.     The DOJ specified, "During approximately November 2007 through approximately October 2008, certain employees at Barclays sometimes raised concerns with individuals at the BBA, the [FSA], the Bank of England, and the Federal Reserve Bank of New York concerning the diminished liquidity available in the market and their views that the Dollar LIBOR fixes were too low and did not accurately reflect the market."[100]  Those employees, the

---

[94] *Id.* at 23 (emphasis added).
[95] *Id.*
[96] *Id.*
[97] Barclays FSA Final Notice ¶ 117.
[98] Barclays CFTC Order at 20.
[99] Barclays DOJ Statement ¶ 41.
[100] *Id.* ¶ 42.

1094456.1                                      - 76 -

1  DOJ found, "attempted to find a solution that would allow Barclays to submit honest rates

2  without standing out from other members of the Contributor Panel, and they expressed the view

3  that Barclays could achieve that goal *if other banks submitted honest rates*."[101]

4      203.   On November 29, 2007, for instance, "a Barclays manager ('Manager-1')

5  contacted a representative of the BBA ('BBA Representative-1')" and stated "that Dollar

6  'LIBORs are being set lower than where they ought to be.'"[102]  "Manager-1" explained to "BBA

7  Representative-1" that LIBOR Panel Banks were "submitting rates that are too low because

8  'banks are afraid to stock their heads above the parapet and post higher numbers because of what

9  happened to [Barclays] when [Barclays] did.  You get shot at.'"[103]  "Manager-1," the DOJ further

10  observed, "named certain other banks that s/he believed were submitting 1-month Dollar LIBORs

11  lower than where those banks could get funds."[104]

12      204.   Additionally, the DOJ observed, "[o]n December 4, 2007, a Barclays LIBOR

13  submitter sent an internal e-mail raising concerns about the Dollar LIBOR rates submitted by

14  Contributor Panel Banks, including Barclays."[105]  The submitter "stated that s/he was submitting

15  1-month Dollar LIBOR lower than s/he was paying, and lower than s/he would have set if 'given

16  a free hand.'"[106]  The submitter further stated "that s/he was worried that the Contributor Panel

17  banks' submissions, including Barclays's, were false and dishonest."[107]

18      205.   The DOJ noted, however, Barclays' communications to regulators "were not

19  intended and were not understood as disclosures through which Barclays self-reported

20  misconduct to authorities."[108]  Indeed, following those communications, "Barclays continued

21  improperly to take concerns about negative publicity into account when making its

22

23  [101] *Id.* (emphasis added).

24  [102] *Id.* ¶ 43.
    [103] *Id.* (alterations in original).

25  [104] *Id.*

26  [105] *Id.* ¶ 45.
    [106] *Id.*

27  [107] *Id.*

28  [108] *Id.* ¶ 42.

1   submissions."[109]  Moreover, the DOJ emphasized, "on other occasions, those employees did not

2   provide full and accurate information during their conversations with these external parties."[110]

3          206.    The findings by the CFTC and the FSA also indicate Barclays knew, when

4   determining the LIBOR quotes it would submit to the BBA on a given day—the quotes its fellow

5   LIBOR Panel Banks intended to submit.

6          207.    The FSA observed, for example, that on November 28, 2007, a LIBOR submitter

7   at Barclays "stated in an internal email that 'LIBORs are not reflecting the true cost of money. I

8   am going to set 2 and 3 months, 5.13 and 5.12 probably at the top of the range of rates set by libor

9   contributors, although brokers tell me that [Panel Bank 7] is going to set at 5.15 for both (up 8.5

10  and 10 from yesterday).  The true cost of money is anything from 5-15 basis points higher.'"[111]

11         208.    Additionally, the CFTC cited a November 29, 2007 telephone discussion involving

12  Barclays' U.S. Dollar LIBOR submitters—as well as their supervisor, who convened the call—

13  and the senior Barclays Treasury managers, during which "[t]he supervisor said if the submitters

14  submitted the rate for a particular tenor at 5.50, which was the rate they believed to be the

15  appropriate submission, Barclays would be twenty basis points above 'the pack' and 'it's going to

16  cause a shit storm.'"[112]  In response to the supervisor's request "that the issue be taken 'upstairs,'

17  meaning that it should be discussed among more senior levels of Barclays' management," the

18  most senior Barclays Treasury manager "agreed that he would do so."[113]  The group decided to

19  set Barclays' LIBOR submission for that day "at the same level as another bank, a rate of 5.3,

20  which was, again, not at the rate the submitters believed to be appropriate for Barclays."[114]

21

22

23

24   ───────────────
     [109] *Id.*

25   [110] *Id.*

26   [111] Barclays FSA Final Notice ¶ 117 (italics and alteration in original).

     [112] Barclays CFTC Order at 21.
27   [113] *Id.*

28   [114] *Id.*

     1094456.1                                    - 78 -
     COMPLAINT

1    209.   Similarly, on March 19, 2008, one Barclays LIBOR submitter "instructed another

2    to reduce Barclays' submissions during a telephone conversation: '*just set it where everyone else*

3    *sets it, we do not want to be standing out*'."[115]

4    210.   Those findings indicate LIBOR Panel Banks—either directly or through

5    intermediaries—informed each other of the quotes they were going to submit before they

6    submitted them. Without such collaboration, Barclays could not be sure the quote it intended to

7    submit would fall "within the pack" or, more specifically, "within ten basis points of the

8    submissions by the other U.S. Dollar panel banks," as Barclays senior Treasury managers had

9    directed. Moreover, it is highly unlikely—if not impossible—that Barclays simply could have

10   predicted its fellow LIBOR Panel Banks' quotes based on their quotes from the previous day

11   (which were published), because LIBOR quotes often differed markedly from day to day. For

12   instance, the FSA observed that on November 29, 2007, "all the contributing banks' submissions

13   for one month US dollar LIBOR increased by a range of 35 to 48 basis points."[116]

14
                 **2.     Materials released, and testimony provided, in the wake of the**
15               **Barclays settlements confirms—and amplifies—the agencies' findings.**

16   211.   The Barclays settlements—particularly the factual findings they entailed—

17   precipitated a management shakeup at the bank. On July 1, 2012, Barclays announced the

18   resignations, effective immediately, of its Chief Executive Officer Robert ("Bob") Diamond and

19   Chief Operating Officer Jerry del Missier, and the next day announced the resignation of its

20   Chairman Marcus Agius.

21   212.   Shortly after those revelations, Bloomberg reported that Diamond's resignation

22   "underscores the disconnect between the market's perception of bank borrowing costs and the

23   benchmark for \$360 trillion of global securities."[117] The article specified that Barclays went from

24   reporting in January 2012 that it could "borrow for three months at interest rates that were on

25   average above other banks" to reporting it could "borrow more cheaply than its peers," even

26   ───────────
     [115] Barclays FSA Final Notice ¶ 123 (italics in original).

27   [116] *Id.* ¶ 118.

28   [117] Paul Armstrong, "Diamond's Exit Shows Libor Only What Each Bank Says It Is," Bloomberg, July 3, 2012.

     1094456.1                              - 79 -

though, according to data compiled by Bloomberg, "the cost of insuring the London-based firm's debt using credit-default swaps rose 33 percent." Bloomberg further stated, "The contrast between banks' daily submissions for Libor and other measures of their creditworthiness shows why regulators from Europe to the U.S. are beginning to fine them for manipulating the market for short-term rates." The article quoted a senior rates specialist at ING Groep NV as stating, "After the Barclays admission, we have proof that Libor is not a reliable benchmark."

213.   Following in the wake of the Barclays settlements, documents and other materials released from several sources—including Barclays, the BBA, the Federal Reserve Bank of New York, and the Bank of England—as well as testimony provided to the British Parliament or the U.S. House of Representatives by key players at Barclays and other institutions, corroborated the findings made in connection with the Barclays settlements and offered further insight into the manipulation of LIBOR.

214.   In testimony before the British Parliament on July 16, 2012, for example, former Barclays CFO Jerry del Missier admitted to directing rate submitters at Barclays to submit false LIBOR quotes to the BBA, which former CEO Bob Diamond had instructed him to do.

215.   Del Missier testified that on October 29, 2008, Diamond "said that he had a conversation with Mr [Paul] Tucker[, Deputy Governor] of the Bank of England, that the Bank of England was getting pressure from Whitehall around Barclays—the health of Barclays—as a result of LIBOR rates, that we should get our LIBOR rates down, and that we should not be outliers." Del Missier "passed the instruction, as [he] had received it, on to the head of the money markets desk." Specifically, he "relayed the contents of the conversation that [he] had with Mr Diamond, and fully expected that the Bank of England's views would be incorporated in the LIBOR submissions," i.e., "[g]iven that Barclays was [submitting] high rates," del Missier "would have expected that taking that into account would have resulted in lower submissions."

216.   Del Missier equivocated when pressed as to whether he believes the submission of artificially low LIBOR quotes was illegal, though he conceded that the Barclays DOJ Statement characterized Barclays' "manipulating its submissions for benchmark interest rates in order to benefit its trading positions and the media's perception of the bank's financial health" as "illegal

1    activity." When asked when he first realized "that [he] had authorised, knowingly or

2    unknowingly, illegal activity, found to be illegal by the US Department of Justice," del Missier

3    stated, "In the early months of 2010."

4        217.    Moreover, though del Missier testified that in late October 2008, making false

5    LIBOR submissions "did not strike [him] as improper," when asked whether he now agrees with

6    the DOJ, del Missier responded, "I am certainly not going to disagree with the Justice

7    Department." In response to the committee chairman's follow-up question—"Does that mean

8    that you agree with it?"—del Missier conceded, "I agree with it."

9        218.    Additionally, contrary to del Missier's testimony that Diamond's instruction to

10   him emanated from the Bank of England, Paul Tucker, Deputy Governor of the Bank, has denied

11   telling Diamond to have Barclays submit lower LIBOR quotes.

12       219.    In testimony before Parliament on July 9, 2012, Tucker recounted that, in speaking

13   with Diamond on the October 29, 2008 call referenced above, Tucker "wanted him to be sure that

14   the senior management of Barclays was overseeing the day-to-day money-market operations and

15   treasury operations and funding operations of Barclays so that Barclays' money desk did not

16   inadvertently send distress signals." Tucker added, "In actual paying up for money in terms of

17   what you borrow, you do not need to be at the top of the market all of the time. It is very

18   important not to come across as desperate. That is not a point about LIBOR submissions, where

19   people should just obey the rules." (Emphasis added). A committee member then asked, "But

20   doesn't the danger of that call being misinterpreted, either by Mr Diamond or its file note being

21   misinterpreted later by Mr del Missier, lie in the fact that you and other participants in the Money

22   Markets Liaison Group were already aware at least a year earlier that there was suspicion on

23   behalf of some of the participants that rates were not being reported accurately?" Tucker

24   responded, in part, "[I]t was not remotely in my mind during this conversation that I could be

25   misinterpreted, either by Bob Diamond or by anybody else."

26       220.    Internal documents released by the Federal Reserve likewise demonstrate

27   Barclays' misconduct and further indicate LIBOR panel banks communicated about their LIBOR

28   submissions before providing them to the BBA. For example, during an October 24, 2008

1094456.1                                        - 81 -

telephone conversation with a representative of the Federal Reserve Bank of New York (as recounted in a transcript released by the New York Fed), a Barclays employee stated "three-month libor *is going to come in at* 3.53." (Emphasis added). The Barclays employee further explained to the Fed representative, "[I]t's a touch lower than yesterday's but please don't believe it. It's absolute rubbish." Later in the call the Barclays employee observed, "[R]ecently you've had certain banks who I know have been paying 25 basis points over where they've set their libors. . .aah just the other day there was one bank who was paying 3.75, he sets his libor at 3.70." (Ellipsis in original).

### 3. U.S. and foreign government entities have also issued findings in connection with settlements with UBS, which demonstrate that UBS submitted unduly low LIBOR quotes during the Relevant Period.

221. On December 19, 2012, the DOJ, CFTC, FSA, and FINMA announced settlements with UBS arising from the bank's attempted and actual manipulation of LIBOR and other benchmark rates. The DOJ also disclosed the filing of a criminal complaint against two former UBS employees. In connection with the settlements, which collectively obligated UBS to pay approximately $1.5 billion, the agencies issued findings detailing UBS's misconduct.

222. The agencies found that during the financial crisis, members of UBS management directed that, in determining the bank's submissions in U.S.-Dollar LIBOR as well as LIBOR for other currencies, LIBOR submitters either "err on the low side" or aim to fall in "the middle of the pack."[118]

---

[118] UBS DOJ Statement ¶ 100; *see also, e.g.*, UBS FSA Final Notice ¶ 22 ("After 9 August 2007, and in reaction to increased media scrutiny of the financial standing of banks and banks' LIBOR submissions during the financial crisis, UBS issued directives to its LIBOR submitters intended to: '*protect our franchise in these sensitive markets*'. These informal directives were disseminated by UBS's Group Treasury and Asset and Liability Management [ALM] Group about the approach to LIBOR submissions."); UBS CFTC Order at 41 ("Certain Group Treasury and ALM managers issued the broad directions without ascertaining or requiring the Trader-Submitters to ascertain the costs of borrowing unsecured funds in the relevant markets or ensuring that such directions were in accord with the definitions and criteria of the benchmark interest rates. . . . When the submitters followed the directions, they impacted UBS's submissions. As a result, at times during the financial crisis, UBS's submissions did not accurately or solely reflect or relate to UBS's assessment of the costs of borrowing funds in the relevant interbank markets."); UBS FINMA Summary Report at 8 ("Evidence suggests that . . . GT [Group Treasury] and Asset and Liability Management (ALM) employees gave improper guidance on UBS's LIBOR submissions on a number of occasions . . . .").

223.    Notwithstanding the long-established requirements with respect to determining LIBOR quotes, from early August 2007 to at least April 2009, "certain UBS managers issued directions for making UBS benchmark interest rate submissions in order to protect against what UBS perceived as unfair and inaccurate negative public and media perceptions about UBS."[119] Specifically, "certain UBS managers and senior managers" in the bank's Group Treasury and Asset and Liability Management ("ALM") groups "directed that UBS LIBOR submitters should either 'err on the low side' in determining UBS's submissions or should make submissions that would be in 'the middle of the pack' of the other Contributor Panel banks."[120] Those Group Treasury and ALM managers "did not provide any guidance to [the] submitters as to how to implement these directions, other than simply to follow them."[121]

224.    The instructions "were issued, at least in significant part, because of concerns that if UBS submitted higher LIBOR rates relative to other banks, UBS could attract negative attention in the media" (which, during "some" period of time, UBS personnel considered "unjustified").[122]  UBS "sought to avoid negative media attention and, relatedly, sought to avoid creating an impression that it was having difficulty obtaining funds."[123]  To the extent those directions from UBS management "were motivated by reputational concerns," they "were inconsistent with the definition of LIBOR."[124]  Moreover, those directions "influenced the formulation of UBS's LIBOR submissions during some periods of time."[125]

> **a.    August 2007 through early April 2008:  UBS directed LIBOR submitters to "err on the low side" of the range of panel banks' quotes.**

225.    The "err on the low side" directive began on August 9, 2007, when an ALM senior manager in Zurich sent an e-mail directing U.S.-Dollar and Euro-LIBOR submitters at UBS "to

---

[119] UBS CFTC Order at 4; *see also* UBS DOJ Statement ¶¶ 124, 131.

[120] UBS DOJ Statement ¶ 100.

[121] UBS CFTC Order at 41.

[122] UBS DOJ Statement ¶ 100.

[123] *Id.*

[124] *Id.*

[125] *Id.*

1094456.1                                    - 83 -

1   'err on the low side' compared to the LIBOR submissions of other Contributor Panel banks, in
2   order to protect [UBS]'s reputation."[126]  That instruction stemmed from media reaction after
3   UBS, earlier that day, "increased its overnight-rate U.S. Dollar LIBOR submission by an
4   unusually high amount from the day before."[127]

5       226.    Following the "unusual" submission, a Bloomberg reporter "contacted UBS to ask
6   for comment . . . and told UBS that the reporter intended to discuss the jump in connection with
7   stories regarding the collapse of the commercial paper market."[128]  The reporter noted UBS and
8   another bank "had been 'hit the worst' and asked for an explanation"; the reporter further
9   indicated "this was a 'huge story.'"[129]

10      227.    The Bloomberg reporter's inquiry "caused concern" within UBS, "especially
11  because UBS was scheduled to announce its quarterly results the following week."[130]  The UBS
12  press office forwarded the reporter's e-mail to a senior manager in the bank's Group Treasury
13  department, observing: "Given that we are announcing our results next week this will need
14  urgent attention."[131]  The senior manager in Group Treasury "was concerned about these events
15  and asked the head of ALM in Zurich to look into the matter."[132]  The head of ALM, in turn,
16  "concluded that the UBS overnight rate LIBOR submission was in fact higher than it should have
17  been," and he "was concerned that the public and press could interpret this high submission as an
18  indication that the bank was having trouble funding itself, when in fact it was not."[133]  The head
19  of ALM therefore "determined that UBS should be submitting LIBORs 'on the low side' relative
20  to other panel banks' submissions," and he "memorialized this decision in an August 9, 2007
21  email to a senior manager in Group Treasury in Stamford[, Connecticut], the manager of the

23  [126] *Id.* ¶ 102.
24  [127] *Id.* ¶ 103.
    [128] *Id.*
25  [129] *Id.*
26  [130] *Id.* ¶ 104.
    [131] *Id.*
27  [132] *Id.*
28  [133] *Id.* ¶ 105.

derivatives trading desk that submitted the majority of UBS's LIBOR contributions, and others."[134]  The ALM head's e-mail stated, "[I]t is highly advisable to err on the low side with fixings for the time being to protect our franchise in these sensitive markets.  Fixing risk and [profit and loss] thereof is secondary priority for now."[135]

228.    That direction "stemmed from a desire to ensure that UBS's LIBOR submissions did not convey to the media or market what UBS believed to be an inaccurate message about UBS's financial stability or otherwise harm UBS's reputation in the increasingly uncertain environment created by the financial crisis."[136]  Indeed, "[t]he idea was that, going forward, UBS's submissions were to portray a view that UBS was more creditworthy than other panel banks and, therefore, UBS should not make higher submissions and be an outlier as compared to other panel banks."[137]

229.    Managers in UBS's Group Treasury and ALM groups did not take "any steps to ensure that the 'err on the low side' direction for making LIBOR submissions complied with the BBA's definition and criteria for making LIBOR submissions or that it related to UBS's costs of borrowing in the London interbank market."[138]

230.    UBS "promptly disseminated the direction to err on the low side."[139]  On August 9, 2007, a UBS rates manager (whom the CFTC identified as "Rates Manager A") "confirmed that the necessary coordination was in place: 'We have already co-ordinated our efforts with [Senior Rates/STIR Manager][140] and [U.S. Dollar Trader-Submitter 1] on the usd libors will be speaking to [U.S. Dollar Trader 1] and [Euro Trader 1] will be liaising with [Senior STIR Manager B] on the eurolibors before our numbers are input.'"[141]

---

[134] *Id.*

[135] *Id.*  The DOJ explained that the e-mail's references to "fixing risk" and profit and loss "reflect an awareness that others at UBS were manipulating LIBOR to benefit trading positions."  *Id.* ¶ 105 n.16.

[136] UBS CFTC Order at 43.

[137] *Id.*

[138] *Id.*

[139] *Id.*

[140] "STIR" stands for "Short Term Interest Rate."

[141] UBS CFTC Order at 43.

231.     U.S. Dollar Trader 1 in Zurich and U.S. Dollar Trader-Submitter 1 in London "discussed the 'err on the low side' direction, and their submissions immediately started reflecting the directions."[142]  On August 10, 2007, for example, the traders engaged in the following exchange:

> U.S. Dollar Trader 1: "o;n just trading way lower . . . so I would go for a pretty low run . . . **aim should really be to be on the lower side of range**"

> U.S. Dollar Trader-Submitter 1: "just looking for early indications for o/n 1w and 2wks – understand mkt dropping fast – so early indics for now then true [levels] at 11 am – pls"

> U.S. Dollar Trader 1: "o/n would go for 5.70 . . . 1wk 5.70 . . . 2wk 5.60 . . . **this seems probably a tad low right now, but recon thats what we should try to be**"

> U.S. Dollar Trader-Submitter 1: **"kk – will check back at 11[when the submissions had to be made] – as you say always want to err on the low side** – thks for colour – may even swap ideas about 1m 2m and 3 mo with you too in curect climate – sure few weeks down the road then will only need to chat about v short dates ie <1mo – appreciate colour"

> U.S. Dollar Trader 1: "np at all . . . we just dont want to give the market a wrong impression . . . we not struggling to get cash . . . so therefore dont want to be on the highs of libors"[143]

232.     On August 14, 2007, U.S. Dollar Trader 1 "confirmed again, 'my indications are deliberately on the low side...' and U.S. Dollar Trader-Submitter 1 agreed, 'y[es] pls err on the side of caution as before – once teh [sic] mkt normalizes...then we can adj accordingly....'"[144]

233.     Additionally, on September 3, 2007, "U.S. Dollar Trader 1 explained to an ALM manager his understanding of why UBS wanted to 'err on the low side,' stating that UBS did not want 'to be seen to pay higher or at libor in the market to avoid trouble.'"[145]  And on September 5, 2007, "U.S. Dollar Trader-Submitter 1 explained he was following the 'err on the low side' direction to his supervisor, Senior Rates Manager C":

---

[142] *Id.*

[143] *Id.* at 44.

[144] *Id.*

[145] *Id.*

"fyi libor has been fuctioning [sic] for many years – current turbulance [sic] and american home owners exposure to libor may trigger further questions – since the mkt dislocation I am now keeping a record of UBS libor fixings vs the implied rates – **we are fixing on the low side of all other banks in the libor panel in the 4- 12 mo period by several bps** – and we are still fixing $12 - 15$ over implied rates – **I can justify my fixings each day if asked** – I se [sic] longer dated libors even lower however the rest of he [sic] mkt continue to call libors higher than UBS – **we should be protected from moral hazard as a bank. Short rates coming grom [sic] Zurich now – again asa [sic] bank we are erring on the low side.**"[146]

234. UBS managers subsequently "monitored how UBS's LIBOR submissions sent signals to the markets and the press about UBS's ability to obtain funds."[147] As part of their "daily internal calls about liquidity and funding as the financial crisis intensified," UBS managers "received internal analyses about UBS's LIBOR submissions relative to other panel banks."[148] Specifically, "UBS ALM Manager A circulated spreadsheets about the panel banks' submissions for U.S. Dollar, Euro, Sterling, Swiss Franc and Yen LIBOR, showing how UBS compared to the other banks."[149] In a September 4, 2007 e-mail, for example, "ALM Manager A wrote, 'For those interested, this new tool shows where each bank on the Libor fixing panel quoted their offer level in today's fixing. Should give some insights into the funding situation at our peers. Note Barclays are consistently amongst the highest contributors and UBS are often the lowest.'"[150] On September 10, 2007, the ALM manager wrote "'we're still contribute [sic] the lowest rates in most currencies.'"[151] Notably, "the spreadsheets and 'tools' provided to the managers did not include information about UBS's actual transactions in the relevant unsecured interbank cash markets or any other information relating to costs of borrowing in those markets."[152]

---

[146] *Id.*

[147] *Id.* at 45.

[148] *Id.*

[149] *Id.*

[150] *Id.*

[151] *Id.*

[152] *Id.*

1094456.1                                      - 87 -

1    235.   UBS's "err on the low side" directive "generally applied to UBS's U.S. Dollar

2    LIBOR submissions for the rest of 2007."[153] The bank's submissions "moved to the lowest

3    quartile of the panel submissions almost immediately after the issuance of the August 9, 2007

4    direction and, in some tenors, often remained in the lowest quartile for the rest of the year and

5    through March 2008."[154] Indeed, UBS's LIBOR submissions continued to fall "on the low side"

6    of the Panel Banks' submissions into April 2008, "when UBS was submitting its 3-month U.S.

7    Dollar LIBOR contribution below the rates it was paying to obtain unsecured funding at that

8    maturity, such as by issuing commercial paper."[155] Commenting on that disparity during an April

9    10, 2008 electronic chat, a UBS derivatives trader in London stated to the senior manager heading

10   ALM, "if we are [issuing commercial paper] at 2.81% and that is 3m libor +10 . . . why aren't we

11   putting our 3m rate in at 2.81% for libors [?]"[156] The ALM senior manager responded, "we

12   should," to which the trader replied, "but then [Group Treasury] will rip our boys a new one for

13   being the highest bank in the poll."[157] After August 9, 2007, "UBS's LIBOR submissions

14   remained generally in the lower half of the Contributing Panel banks' contributions until April

15   2008."[158]

16          **b.      April-May 2008:  UBS directed its LIBOR submissions to fall
                      within the "middle of the pack" of panel banks.**

17

18   236.   The "err on the low side" directive ceased in the wake of *The Wall Street Journal*'s

19   April 16, 2008 article reporting that U.S.-Dollar LIBOR panel banks, including UBS, "were

20   routinely submitting inaccurately low LIBORs in order to make themselves appear more

21   creditworthy," as well as the BBA's announcement the same day that "it would expel any banks

22   from the Contributor Panel if it found that they were deliberately making inaccurate LIBOR

23

24   _____
     [153] *Id.*
25   [154] *Id.* at 46.
26   [155] UBS DOJ Statement ¶ 110.
27   [156] *Id.*
     [157] *Id.*
28   [158] *Id.* ¶ 111.

     1094456.1                                - 88 -

1  submissions."[159] The next day, "all of UBS's U.S. Dollar LIBOR submissions rose

2  substantially," as they did the following day [April 18, 2008]."[160]

3      237.    Following the *Journal* article and the BBA announcement, the "err on the low

4  side" instruction "was initially replaced with a new effort to make LIBOR submissions 'in the

5  middle of the pack' of the Contributing Panel banks."[161]  In that regard, on April 17, 2008, a UBS

6  advisor "tasked with advising the U.S. Dollar submitter each day" sent an e-mail to the U.S.-

7  Dollar LIBOR submitter "informing him/her that 'the guidance I got from my management with

8  regards to libors is that we should aim to be in the middle of the pack . . . ([Group Treasury] got

9  on their back again as well).'"[162]  "Immediately" after that direction was issued on or about April

10 17, 2008, "UBS's LIBOR submissions were in the middle of the submissions of the Contributor

11 Panel banks for the next several days."[163]

12     238.    Notably, on May 21, 2008, in response to a *Wall Street Journal* reporter's question

13 to UBS, by e-mail, "why back in mid-April [2008] UBS had been 'paying 12 basis points for CP

14 [commercial paper] more than it was posting as a Libor quote?'", the senior manager heading

15 ALM forwarded a proposed answer to the Group Treasury senior manager in Stamford,

16 Connecticut:  'the answer would be 'because the whole street was doing the same and because we

17 did not want to be an outlier in the libor fixings, just like everybody else."[164]

18     239.    Communications reflecting the "middle of the pack" approach "continued in late

19 2008 and early 2009."[165]  Moreover, "[t]he directive to submit LIBOR contributions to be in the

20 middle of the pack of other banks' anticipated submissions was well known to certain LIBOR

21 submitters and their managers."[166]

22

23 [159] *Id.* ¶ 114.

24 [160] *Id.*
    [161] *Id.* ¶ 115.
25 [162] *Id.*

26 [163] *Id.* ¶ 116.
    [164] *Id.* ¶ 117.
27 [165] *Id.* ¶ 124.

28 [166] *Id.* ¶ 129.

1094456.1                                    - 89 -

**c. June 17, 2008 to at least early 2009: UBS revived its "middle of the pack" directive.**

240. After briefly discontinuing its "middle of the pack" directive, by June 17, 2008, "in reaction to being a high outlier on the U.S. Dollar panel," UBS "decided to return to the 'middle of the pack.'"[167] That day, "Senior STIR Manager C went to the trading floor in Zurich and directed that UBS's LIBOR submissions be lowered so that UBS would be in 'the middle of the pack' of the submitting banks."[168] Also that day, "U.S. Dollar Trader-Submitter 3 discussed with ALM Manager B the need to implement the 'middle of the pack' direction quickly and that the 'middle of the pack' direction would be in place 'until further notice.'"[169]

241. From June 17 through December 2008, "UBS was in the middle of the pack virtually every day, with very little deviation in its submissions."[170] Indeed, UBS "remained in the middle of the pack even after October 16, [2008], when it received approximately $59 billion in funds from the Swiss government and the Swiss National Bank and borrowed over $77 billion from the various liquidity programs of the Federal Reserve Bank."[171] UBS "continued to submit in the middle of the pack throughout at least the first half of 2009, despite UBS's February 10, 2009 announcement of an 8.1 billion Swiss Franc loss for the fourth quarter of 2008."[172]

242. In sum, UBS "knew that concerns about reputation or perceived inaccurate negative market or press reports were not legitimate or permissible factors on which to base [its] daily LIBOR and other benchmark interest rate submissions."[173] Despite that understanding,

[167] *Id.*

[168] *Id.*; *see also* UBS DOJ Statement ¶ 120 (finding that "[d]uring the week of June 16, 2008," a Zurich-based UBS senior manager "directed U.S. Dollar LIBOR submitters to lower their submissions over the next three days 'to get in line with the competition' because, by contributing LIBOR submissions closer to CD and CP [commercial paper] issuance levels, UBS was becoming an outlier relative to other Contributor Panel banks").

[169] UBS CFTC Order at 50.

[170] *Id.* at 51.

[171] *Id.*

[172] *Id.* at 51-52. The DOJ found that the "middle of the pack" directive lasted until about April 2009. The DOJ specified that for "approximately the next 10 months" after the week of June 16, 2008, UBS's three-month U.S.-Dollar LIBOR submissions "were identical to the published LIBOR fix, and largely consistent with the published LIBOR fix in the other tenors." UBS DOJ Statement ¶ 122.

[173] UBS CFTC Order at 52.

1094456.1                                      - 90 -
COMPLAINT

1  UBS "at times" during the financial crisis "made its U.S. Dollar LIBOR submissions and other

2  benchmark interest rate submissions in accordance with Group Treasury and ALM managers'

3  directions, and not in accordance with the relevant definitions and criteria for those rates."[174]

4  Those submissions "were knowingly false because such submissions did not reflect solely UBS's

5  assessment of the costs of borrowing unsecured funds in the relevant interbank market at that

6  time."[175] The submissions thus "constituted false, misleading or knowingly inaccurate reports

7  that affected or tended to affect LIBOR, Euribor or Euroyen TIBOR."[176]

8      243.   Moreover, UBS "fail[ed] to take reasonable care to organise and control its affairs

9  responsibly and effectively with adequate risk management systems, in relation to its LIBOR and

10  EURIBOR submissions process."[177] The duration and extent of UBS's wrongdoing were

11  "exacerbated by these inadequate systems and controls."[178] Indeed, from January 1, 2005 to

12  August 2008, "UBS had no systems, controls or policies governing the procedures for making

13  LIBOR submissions."[179]

14  **H.**   **The Ongoing LIBOR Government Investigations, which Have Targeted Many (If Not All) of the LIBOR Panel Banks, Are Expected to Produce Additional Settlements or Charges.**

15

16      244.   During the 10 months since the Barclays settlements were publicly disclosed, news

17  has continued to emerge regarding the likelihood that other LIBOR panel banks will settle, or be

18  charged with liability by, government agencies in the U.S. or abroad. And, indeed, as recounted

19  above, during the past several months government entities (including the DOJ and the CFTC)

20  have entered into agreements with UBS and RBS, and the DOJ has brought claims against

21  individuals from UBS and entered into a plea agreement with RBS Securities Japan Ltd. (for

22  alleged misconduct relating to Yen-LIBOR). Indications are that settlements or charges against

23  other LIBOR panel banks are in the offing.

24  [174] *Id.*

25  [175] *Id.*

26  [176] *Id.*

27  [177] UBS FSA Final Notice ¶ 25.
   [178] *Id.*

28  [179] *Id.* ¶ 26.

1094456.1         - 91 -

245. On July 12, 2012, Bloomberg reported the LIBOR scandal "has the potential to become one of the most costly and consequential in the history of banking."[180] The editorial further observed that investigators in the U.S., Canada, Europe, and Asia "are piecing together a breathtaking portrait of avarice and deceit" and that Barclays' $450-million penalty "is only the beginning," as "[r]egulators can and should hit more banks with large fines to prevent a repeat." Additionally, the editors noted, "criminal charges for the first time could threaten a significant number of bankers and traders with jail terms for their actions during the financial crisis -- a much needed comeuppance that could help reset the industry's moral compass."

246. Commenting to *The New York Times* on the Barclays settlements, Benjamin Heineman, former general counsel of General Electric and now a distinguished senior fellow at Harvard Law School, observed, "This looks like a classic case where they [the government] squeezed Barclays and Barclays yelped, which will be important for the making of cases against other Libor banks. There was obviously collusion with other banks."[181]

247. The media further reported, based on information obtained from government officials, that government investigations regarding LIBOR manipulation stretch well beyond Barclays and are likely to result in settlements, fines—and even criminal liability—for other banks.

248. On July 14, 2012, for example, *The New York Times* reported the DOJ "has identified potential criminal wrongdoing by big banks and individuals at the center of the [LIBOR] scandal," as the department's criminal division "is building cases against several financial institutions and their employees."[182] The article noted the authorities "expect to file charges against at least one bank later this year," according to a government official. The *Times* further reported that the multiyear LIBOR investigation "has ensnared more than 10 big banks in the United States and abroad" and that "the prospects of criminal action" have caused "several firms" to "scramble[e] to arrange deals, according to lawyers close to the case."

[180] Editorial, "The Worst Banking Scandal Yet?" Bloomberg, July 12, 2012.

[181] James B. Stewart, "Calculated Deal in a Rate-Rigging Inquiry," *The New York Times*, July 13, 2012.

[182] Ben Protess & Mark Scott, "U.S. Is Building Criminal Cases in Rate-Fixing," *The New York Times*, July 14, 2012.

1094456.1                                              - 92 -

249.    A July 20, 2012 *CNNMoney* article posited "Barclays the biggest Libor liar? No, that may have been Citi."[183]   The article observed that Citigroup CEO Vikram Pandit recently had "told analysts not to use Barclays' \$450 million Libor settlement as a guidepost for what his firm might have to pay." Citing the study by Snider and Youle detailed above—showing that "on average Citi understated its borrow[ing] costs by an average of 0.12 percentage points from August 2007 to August 2008," which was "50% more than the 0.08 percentage points that Barclays under report[ed] its own borrowing costs"—the article suggested Citigroup "might end up paying much more" than Barclays did.

250.    On July 22, 2012, Reuters reported U.S. prosecutors and European regulators "are close to arresting individual traders and charging them with colluding to manipulate global benchmark interest rates, according to people familiar with a sweeping investigation into the rate-rigging scandal."[184]   Reuters further noted it previously had reported "that more than a dozen current and former employees of several large banks are under investigation, including Barclays Plc, UBS and Citigroup, and have hired defense lawyers over the past year as a federal grand jury in Washington, D.C., continues to gather evidence."   Reuters later reported, on August 4, 2012, that Ryan Reich, a "former Barclays Plc swaps trader in New York" whom Barclays fired in 2010, "is among those drawing scrutiny from prosecutors in the deepening scandal over the manipulation of global benchmark interest rates."[185]   According to "several people familiar with the situation," Reuters noted, "U.S. prosecutors in Washington, D.C. are looking at . . . Reich's activities while at Barclays between August 2006 and March 2010."   The article further observed that Reich "was a part of a low-profile New York trading desk at Barclays that is now increasingly in focus as prosecutors and regulators extend their investigation of the Libor scandal."

---

[183] Stephen Gandel, "Barclays the biggest Libor liar? No, that may have been Citi," *CNNMoney*, July 20, 2012.

[184] Matthew Goldstein, Jennifer Ablan & Philipp Halstrick, "Libor Investigation Close To Making Arrests: Report," Reuters, July 22, 2012.

[185] Jennifer Ablan, Matthew Goldstein & Carrick Mollenkamp, "Fired Barclays trader draws scrutiny in Libor probe," Reuters, Aug. 4, 2012.

1094456.1                                        - 93 -

1    251.    On July 24, 2012, *The Wall Street Journal* similarly reported, based on

2 information provided by "people close to the [LIBOR] probe," that "[t]he emerging details about

3 traders suggest to investigators a widespread conspiracy that continued for several years and

4 cascaded around the world."[186] The *Journal* observed that "[t]he widening interest-rate scandal"

5 has "ensnared at least 16 financial institutions." The article further noted regulators and

6 prosecutors "are being helped by Barclays and . . . UBS AG, which employed traders who

7 allegedly were leaders of two groups now under investigation, according to people familiar with

8 the matter."

9    252.    On July 27, 2012, Reuters reported Lloyds Banking Group had "received

10 subpoenas from government agencies" investigating the LIBOR scandal, which the bank

11 disclosed in its 2011 annual report.[187]

12    253.    On August 2, 2012, Bank of America disclosed in an SEC filing that it had

13 received subpoenas and requests for information from the DOJ, CFTC, and FSA concerning

14 "submissions made by panel banks in connection with the setting of London interbank offered

15 rates and European and other interbank offered rates."

16    254.    Revelations concerning other LIBOR panel banks have come to light as well. On

17 August 8, 2012, for example, *The Wall Street Journal* reported that U.S. prosecutors "have agreed

18 to shield several former UBS AG employees from criminal charges in return for their cooperation

19 with the escalating investigation of suspected interest-rate manipulation," according to "a person

20 close to the probe."[188] The *Journal* further reported that, according to one of its sources, the

21 DOJ's Antitrust Division "is investigating suspected collusion between different banks to

22 manipulate interest rates, including [LIBOR]," while the DOJ's Fraud section "is focusing on

23 alleged wrongdoing within individual firms."

24

25

---

26 [186] Jean Eaglesham & David Enrich, "Libor Probe Expands to Bank Traders," *The Wall Street Journal*, July 27, 2012.

27 [187] Matt Scuffham & Steve Slater, "British bank Lloyds gets Libor subpoenas," Reuters, July 24, 2012.

28 [188] Jean Eaglesham & Joe Palazzolo, "Ex-UBS Traders Offered Deal by U.S. in Rate Probe," *The Wall Street Journal*, Aug. 8, 2012.

1    255.    JPMorgan also resides at the center of the LIBOR storm. On August 9, 2012,

2  JPMorgan disclosed in an SEC filing that regulators had asked the bank for information—through

3  subpoenas, requests for documents, and, in some cases, interviews, from the DOJ, CFTC, SEC,

4  FSA, European Commission, Canadian Competition Bureau, Swiss Competition Commission,

5  and other regulatory authorities and banking associations around the world.

6    256.    On September 5, 2012, as reported by Reuters, the CEO of Société Générale,

7  Frederic Oudea, stated the bank is cooperating with U.S. authorities in connection with their

8  LIBOR investigation, while the bank continues its own internal probe.[189]

9    257.    Revelations about regulators' investigations of other LIBOR panel banks likewise

10  have recently emerged. Bloomberg reported on October 26, 2012 that Bank of America, RBC,

11  and Société Générale "are among nine additional banks subpoenaed in a multistate investigation

12  of alleged manipulation of Libor," according to a source "familiar with the matter." Bloomberg

13  further detailed that New York Attorney General Eric Schneiderman issued the subpoenas

14  starting in August 2012. According to Bloomberg's source, Attorney General Schneiderman and

15  Connecticut Attorney General George Jepsen, in connection with their joint investigation into

16  possible LIBOR manipulation, have subpoenaed 16 banks in total, including (aside from the three

17  banks identified above) JPMorgan Chase and Barclays.

## PLAINTIFFS DID NOT KNOW, NOR COULD THEY REASONABLY HAVE KNOWN, ABOUT DEFENDANTS' MISCONDUCT UNTIL AT LEAST MARCH 2011

258.    Before UBS's March 15, 2011 announcement that it had been subpoenaed in

connection with the U.S. government's investigation into possible LIBOR manipulation,

Plaintiffs had not discovered, and could not with reasonable diligence have discovered, facts

indicating Defendants were knowingly engaging in misconduct that caused LIBOR to be

artificially depressed during the Relevant Period.

259.    Moreover, though some market participants voiced concerns in late 2007-early

2008 that LIBOR did not reflect banks' true borrowing costs, those concerns were quickly—

though, it now turns out, wrongly—dismissed.

---

[189] "SocGen cooperating with U.S. in Libor probe," Reuters, Sept. 5, 2012.

1094456.1                                          - 95 -

**A.      Defendants' Unlawful Activities Were Inherently Self-Concealing.**

260.    Defendants conspired to share information regarding their LIBOR quotes and to misrepresent their borrowing costs to the BBA.  In so doing, Defendants aimed to, and did, depress LIBOR to artificially low levels, which allowed them to pay unduly low interest rates on LIBOR-based financial instruments they or others issued or sold to investors, including Plaintiffs.

261.    Defendants' misconduct was, by its very nature, self-concealing.  First, those banks' actual or reasonably expected costs of borrowing were not publicly disclosed, rendering it impossible for investors, including Plaintiffs, to discern (without sophisticated expert analysis) any discrepancies between Defendants' publicly disclosed LIBOR quotes and other measures of those banks' actual or reasonably expected borrowing costs.  Second, communications within and among the banks likewise were not publicly available, which further precluded investors, including Plaintiffs, from discovering Defendants' misconduct, even with reasonable diligence.

262.    As a result of the self-concealing nature of Defendants' collusive scheme, no person of ordinary intelligence would have discovered, or with reasonable diligence could have discovered, facts indicating Defendants were unlawfully suppressing LIBOR during the Relevant Period.  Indeed, particularly given the extraordinary disruption affecting the financial markets during much of the Relevant Period, no reasonable investor would have had reason to suspect that any observable discrepancies between LIBOR and other measures of Defendants' costs of borrowing were due to misconduct—particularly knowing misconduct—rather than market dislocation.

**B.      The BBA and Defendants Deflected Concerns Raised by Some Market Observers and Participants In Late 2007 and Early 2008 About LIBOR's Accuracy.**

263.    In November 2007, a concern arose among some in the U.K. banking community that the members of the USD-LIBOR panel might be understating their true costs of borrowing, thus causing LIBOR to be set artificially low.  Some U.K. banks raised their concerns at a meeting of the Bank of England that month.

264.    In response to those concerns, specifically "anecdotal evidence gathered from conversation with market participants . . . that the rates quoted and paid by banks on their

1094456.1                                    - 96 -

1    interbank borrowing tended to vary more than usual (and by more than what appears in the

2    LIBOR panel) during the turbulence," the Bank for International Settlements ("BIS") in Spring

3    2008 produced a study of USD-LIBOR. The BIS examined the difference, or "spread," between

4    USD-LIBOR and OISs, which are viewed as virtually risk-free, thus the positive difference

5    between LIBOR and interest rates on those swaps should reflect the credit risk of the quoting

6    banks. The BIS then compared the LIBOR-OIS spread to the cost of CDS insurance on the BBA

7    panel banks' debt. Absent manipulation, those two values should exhibit a stable relationship,

8    because they both depend on the same thing: the credit risk of the quoting banks.

9         265.   Contrary to that expectation, the BIS found an unusually "loose" relationship

10   between CDS premiums and the LIBOR-OIS spread, beginning in August 2007 and continuing at

11   least into 2008, when the BIS published its findings. During that time, CDS premiums led the

12   LIBOR-OIS spread in an upward trend. In other words, the cost of CDS insurance on the panel

13   banks' debt increased more swiftly than the difference between LIBOR and interest rates on OIS,

14   when the two values should have behaved similarly.

15        266.   In May 2008, after *The Wall Street Journal* reported its LIBOR analysis (detailed

16   above), strategist Tim Bond of Barclays, admitted "the rates the banks were posting to the BBA

17   became a little divorced from reality" during 2007-2008, adding:

18              We had one week in September where our treasurer, who takes his
                responsibilities pretty seriously, said, "Right, I've had enough of
19              this, I'm going to quote the right rates". All we got for our pains
                was a series of media articles saying that we were having difficulty
20              financing.[190]

21        267.   Additionally, in a report published mid-April 2008 entitled "Is LIBOR Broken?",

22   Citigroup's Scott Peng wrote "Libor at times no longer represents the level at which banks extend

23   loans to others." He concluded that LIBOR was suppressed by 30 basis points. Peng resigned

24   approximately one year later. Reports of his resignation referenced his disclosures about LIBOR.

25   On April 18, 2008, Credit Suisse's William Porter, a credit strategist, estimated an even greater

26   suppression: 40 bps (as reported that day by *The Wall Street Journal*).

27

28   [190] http://www.telegraph.co.uk/finance/newsbysector/banksandfinance/2790833/Libor-credibility-
     questioned-by-Barclays-strategist.html.

268.  On April 3, 2008, the Bank of England money-market committee held a meeting of U.K. banks. The minutes of that meeting state: "U.S. Dollar Libor rates had at times appeared lower than actual traded interbank rates."

269.  As a result of the concerns and statements recounted above, the BBA conducted an inquiry regarding LIBOR. Notably, shortly after the BBA announced its investigation, the LIBOR panel banks raised their quotes, causing LIBOR to log its biggest increase since August 2007. Defendants thus falsely and misleadingly signaled that any improper reporting of false rates that may have previously occurred had ended.

270.  Additionally, the BBA ultimately determined—wrongly, it later turned out—that LIBOR had not been manipulated, thus providing further (incorrect) assurance to investors that the concerns expressed by some market participants were unfounded.

271.  After *The Wall Street Journal*'s April 16, 2008 article questioning LIBOR's accuracy, for instance, the BBA engaged in what its executives characterized as a "charm offensive,"[191] contacting investors and journalists to dispel concerns regarding LIBOR.

272.  At that time, the BBA publicly announced it would expel any panel bank that deliberately submitted inaccurate LIBOR quotes.[192] The BBA also stated it would conduct an expedited "intensive review" of its LIBOR process but that it did not believe panel banks had submitted false quotes.[193]

273.  Moreover, Defendants engaged in a media strategy that diffused the speculation that had arisen concerning LIBOR—and further concealed their conduct. On April 21, 2008, for instance, Dominic Konstam of Credit Suisse affirmatively stated the low LIBOR rates were attributable to the fact that U.S. banks, such as Citibank and JPMorgan, had access to large customer deposits and borrowing from the Federal Reserve and did not need more expensive

---

[191] David Enrich & Max Colchester, "Before Scandal, Clash over Control of Libor," *The Wall Street Journal*, Sept. 11, 2012, available at
http://online.wsj.com/article.SB10000872396390044384740457763 1404235329424.html.

[192] UBS DOJ Statement ¶ 114.

[193] Carrick Mollenkamp & Laurence Norman, "British Bankers Group Sets Up Review of Widely Used Libor," *The Wall Street Journal*, Apr. 17, 2008, available at
http://online.wsj.com/article/SB120838284713820833.html.

1094456.1                                          - 98 -

1   loans from other banks: "Banks are hoarding cash because funding from the asset-backed

2   commercial paper market has fallen sharply while money market funds are lending on a short

3   term basis and are restricting their supply."[194]

4       274.    Also that day, Jeffrey Rosenberg, head of credit strategy at Banc of America

5   Securities, asserted that the variations in LIBOR resulted from the way the BBA calculates

6   LIBOR. Specifically, he said the BBA's approach "works when both overall bank risk is low and

7   the dispersion of risks across banks is small . . . [which] is clearly not the case currently."[195] The

8   same article in which Rosenberg's statements were recounted also quoted unidentified "bankers"

9   as stating it was "unlikely that this discrepancy has arisen because banks have deliberately been

10  colluding to keep LIBOR rates down."[196]

11      275.    In an April 28, 2008 interview with the *Financial Times*, Credit Suisse's Konstam

12  continued to defend LIBOR's reliability:

13          Libor has been a barometer of the need for banks to raise capital.
            The main problem with Libor is the capital strains facing banks …
14          Initially there was some confusion that Libor itself was the
            problem, with talk of the rate being manipulated and not
15          representative of the true cost of borrowing.[197]

16      276.    On May 16, 2008, in response to a media inquiry, JPMorgan commented "[t]he

17  Libor interbank rate-setting process is not broken, and recent rate volatility can be blamed largely

18  on reluctance among banks to lend to each other amid the current credit crunch."[198]

19      277.    The same day, Colin Withers of Citigroup assured the public that LIBOR remained

20  reliable, emphasizing "the measures we are using are historic -- up to 30 to 40 years old."[199]

21

22  ――――――――――――――
    [194] Gillian Tett & Michael Mackenzie, "Doubts Over Libor Widen," FT.com, available at
23  http://www.ft.com/cms/s/0/d1d9a792-0fbd-11dd-8871-0000779fd2ac.html#axzz1szdS58jE.
    [195] *Id.*
24
    [196] *Id.*
25  [197] Michael Mackenzie, "Talk of quick fix recedes as Libor gap fails to close," FT.com, available at
26  http://www.ft.com/intl/cms/s/0/3da27a46-5d05-11dd-8d38-000077b07658.html#axzz1szdS58jE.
    [198] Kirsten Donovan, Jamie McGeever, Jennifer Ablan, Richard Leong & John Parry, "European, U.S.
27  bankers work on Libor problems," reuters.com, available at
    http://in.reuters.com/article/2008/05/16/markets-rates-bba-idINL162110020080516.
28  [199] *Id.*

    1094456.1                              - 99 -

278. And in May 2008, *The Wall Street Journal* asked numerous Defendants to comment on the media speculation concerning aberrations in LIBOR. Rather than declining or refusing to comment, those Defendants made affirmative representations designed to further conceal their wrongdoing. On May 29, 2008, for instance, Citibank affirmatively claimed innocence and stated it continued to "submit [its] Libor rates at levels that accurately reflect [its] perception of the market." HBOS similarly asserted its LIBOR quotes constituted a "genuine and realistic" indication of the bank's borrowing costs.[200]

279. More recent analyses and investigations by government entities further demonstrates there was insufficient information about *wrongdoing* to put investors, including Plaintiffs, on inquiry notice of their claims. For example, a recently released internal report prepared by the New York Fed in May 2008 observed, "*Beyond the anecdotal evidence and LIBOR re-sets, it is difficult to find convincing evidence of actual misreporting.* Few public sources of data on actual Eurodollar transaction rates exist, and again, the extent of credit tiering makes it difficult to extrapolate from what data there is . . . ." (Emphasis added).

280. Similarly, the FSA—which, as noted above, has been engaged in an intensive and lengthy investigation of LIBOR manipulation—recently observed that the evidence of "dislocation" with respect to LIBOR "did not in itself . . . carry any implication that 'lowballing' was occurring."[201]

281. Indeed, even the April 16, 2008 *Journal* article that questioned LIBOR's accuracy cautioned "no specific evidence has emerged that banks have provided false information about borrowing costs."[202]

---

[200] Carrick Mollenkamp & Mark Whitehouse, "Study Casts Doubt on Key Rate."

[201] FSA Internal Audit Report, "A Review of the Extent of Awareness within the FSA of Inappropriate Libor Submissions, Management Response," ¶ 1.5 (Mar. 2013), available at www.fsa.gov.uk/static/pubs/other/ia-libor-management-response.pdf.

[202] Mollenkamp, "Bankers Case Doubt on Key Rate Amid Crisis."

1  **C.    Expert Analysis Performed in Connection with the LIBOR MDL Proceedings**
2       **Indicates LIBOR's Increase Following Expressions of Concern Over**
        **LIBOR's Viability Resulted from Defendants' Attempt to Conceal Their**
3       **Misconduct.**

4       282.    On April 17, 2008, the day after *The Wall Street Journal* initially reported on

5  LIBOR's anomalous behavior and the BBA stated it would conduct an inquiry concerning

6  LIBOR, there was a sudden jump in USD-LIBOR—the three-month borrowing rate hit 2.8175%

7  that day, about eight basis points more than the previous day's rate of 2.735%.

8       283.    Suspiciously, reported LIBOR rates for other currencies fell or remained relatively

9  flat at the time USD-LIBOR rose, a sign that the latter was susceptible to manipulation.

10      284.    A consulting expert engaged by the Schwab Plaintiffs and other plaintiffs in the

11  LIBOR MDL Proceedings conducted an analysis of the change in LIBOR on April 17, 2008. The

12  analysis tested the hypothesis that if banks did not manipulate LIBOR, there would be no

13  systematic changes in LIBOR expected on April 17, whereas if banks did manipulate LIBOR—

14  and were responding to *The Wall Street Journal* article and the BBA's announcement following

15  it—the reporting banks would be likely to reduce or abandon the manipulation immediately in

16  response to those events. An immediate reduction in LIBOR manipulation would result in an

17  increase in LIBOR quotes by the member banks on April 17, 2008.

18      285.    To conduct the analysis, the consulting expert ran a regression using the daily

19  changes in LIBOR. Table 1 below shows the study results. As discussed above, LIBOR

20  increased on April 17, 2008 at a statistically significant level. Moreover, 10 of the 16 bank quote

21  increases were statistically significant. These findings were consistent with the hypothesis that

22  the banks manipulated and suppressed LIBOR.

23

24

25

26

27

28

1094456.1                                    - 101 -

**Table 1**

**Changes in LIBOR on April 17, 2008***

| | Dependent variable | Average change in LIBOR during the period 1/5/2000 – 5/13/2011 | April 17, 2008 Reported Increase | Statistical Significance at the 1-5% level of the April 17, 2008 move |
|---|---|---|---|---|
| 1 | BBA LIBOR | -0.00203 | 0.08578 | 5% |
| 2 | HSBC LIBOR | -0.00167 | 0.12167 | 1% |
| 3 | JPMC LIBOR | -0.00203 | 0.08203 | 5% |
| 4 | BARCLAYS LIBOR | -0.00202 | 0.10202 | 5% |
| 5 | WEST LB LIBOR | -0.00199 | 0.09199 | 5% |
| 6 | RBS LIBOR | -0.00201 | 0.08701 | 5% |
| 7 | RABOBANK LIBOR | -0.00206 | 0.08206 | 5% |
| 8 | CITI LIBOR | -0.00203 | 0.09703 | 5% |
| 9 | UBS LIBOR | -0.00245 | 0.09745 | 5% |
| 10 | NORIN LIBOR | -0.00204 | 0.09204 | 5% |
| | *Statistical significance is assessed using a AR(3) model for the residuals. | | | |

286.    An alternative hypothesis is that, in addition to reacting to the *Journal*, other confounding effects that are related to the risk of the banks could have emerged on April 16, 2008 and April 17, 2008. This alternative hypothesis also predicts an increase in LIBOR. To test this alternative hypothesis, instead of looking at daily changes in LIBOR quotes, it is possible to see daily changes in the difference between banks' LIBOR quotes and the Federal Reserve Eurodollar Deposit Rate (the "Spread"). If risk related factors played a role, they would affect both the banks' LIBOR quotes as well as the Federal Reserve's Eurodollar Deposit Rate. Thus, if this hypothesis is correct, one should not see any changes to the Spread on April 17, 2008, since these two effects should cancel out. However, if there were no risk related news and only a reaction to the *Journal* article and the BBA announcement played a major role, then only LIBOR would be affected, leaving Federal Reserve's Eurodollar Deposit Rate mostly unaffected. In this case, the Spread would again be expected to increase.

287.    The test of this alternative hypothesis showed that the Spreads of all 16 panel banks increased on April 17, 2008, and, as shown in Table 2 below, 11 of the 16 changes were statistically significant at levels ranging from 1% to 5%. Once again, these finding were

1094456.1                                                - 102 -

1  consistent with the manipulation hypothesis and inconsistent with the hypothesis that other risk

2  factors explained the April 17, 2008 shock to the LIBOR rate.

3

**Table 2**

### Changes in Spread on April 17, 2008*

| | Dependent variable | Average change in LIBOR during the period 1/5/2000 – 5/13/2011 | April 17, 2008 Reported Increase | Statistical Significance at the 1-5% level of the April 17, 2008 move |
|---|---|---|---|---|
| | | | | |
| 1 | BBA LIBOR Spread | -0.00007507 | 0.08383 | 5% |
| 2 | HSBC LIBOR Spread | 0.00024665 | 0.11975 | 1% |
| 3 | JPMC LIBOR Spread | -0.00016117 | 0.08016 | 5% |
| 4 | BARCLAYS LIBOR Spread | -0.00010337 | 0.1001 | 1% |
| 5 | RBS LIBOR Spread | -0.00010924 | 0.08511 | 5% |
| 6 | TOKYO LIBOR Spread | 0.00001534 | 0.07998 | 5% |
| 7 | CITI LIBOR Spread | -0.00016073 | 0.09516 | 5% |
| 8 | CS LIBOR Spread | -0.0001738 | 0.07017 | 5% |
| 9 | RBC LIBOR Spread | -0.00010722 | 0.09511 | 5% |
| 10 | UBS LIBOR Spread | -0.00011816 | 0.09512 | 5% |
| 11 | NORIN LIBOR Spread | -0.00020698 | 0.09021 | 1% |
| * Statistical significance is assessed using a AR(3) model for the residuals. | | | | |

**D.  Investors, Including Plaintiffs, Certainly Could Not Have Known or Reasonably Discovered—Until at Least March 2011—Facts Suggesting Defendants _Knowingly Acted_ to Suppress LIBOR.**

288.  Notwithstanding the smattering of statements in late 2007-early 2008 questioning

LIBOR's viability, Plaintiffs had no reason to suspect—at least until the existence of government

investigations was revealed in March 2011—that Defendants were *knowingly acting* to suppress

LIBOR.  Indeed, as a result of Defendants' secret conspiracy and their purposeful concealment of

relevant information, no facts arose before March 2011 to put Plaintiffs on inquiry notice that a

conspiracy to manipulate LIBOR existed.

1094456.1                                      - 103 -

COMPLAINT

1

**PLAINTIFFS SUFFERED SIGNIFICANT HARM AS A RESULT OF DEFENDANTS' MISCONDUCT**

2

3

A.    **Defendants' Suppression of LIBOR Broadly Impacted LIBOR-Based Financial Instruments.**

4    289.    Throughout the Relevant Period, Defendants' manipulation of LIBOR caused

5    damage to Plaintiffs by artificially depressing the value of billions of dollars in LIBOR-based

6    financial instruments they held or purchased. Most of those instruments fall into one of the

7    following categories.

8    290.    Floating-rate instruments. Throughout the Relevant Period, Plaintiffs bought and

9    usually held to maturity floating-rate instruments indexed to LIBOR. These obligations paid a

10    rate of return based on LIBOR; specifically, they paid LIBOR plus an additional fixed rate of

11    return. These floating-rate instruments included, among others, commercial paper and certificates

12    of deposit. "Commercial paper" refers to an unsecured promissory obligation with a fixed

13    maturity typically of up to nine months. Such obligations are issued and sold by large

14    corporations and banks in order to raise short-term funds. "Certificates of deposit" are time

15    deposits with a financial institution such as a credit union or bank. Defendants' suppression of

16    LIBOR caused Plaintiffs to receive lower returns on these obligations than they would have if

17    LIBOR had been properly set, which was a foreseeable result of Defendants' misconduct.

18    Plaintiffs relied on the accuracy of LIBOR in undertaking these transactions.

19    291.    The floating-rate instruments affected by Defendants' misconduct include those (i)

20    issued or sold to Plaintiffs by Defendants, (ii) sold to Plaintiffs by subsidiaries or other affiliates

21    of Defendants, and (iii) issued or sold to Plaintiffs by third parties.

22    292.    Fixed-rate instruments. Throughout the Relevant Period, Plaintiffs bought, and

23    usually held to maturity, fixed-rate instruments such as commercial paper and certificates of

24    deposit, which paid a fixed rate of return. When considering whether to purchase a fixed-rate

25    instrument, Plaintiffs evaluated the difference (or "spread") between the offered rate and LIBOR.

26    A large positive spread to LIBOR might make the offering "rich," depending on the credit risk of

27    the issuer. A lower positive spread or a negative spread might make the offering less attractive,

28    again depending on the quality of the issuer. This is a common analysis undertaken by

1094456.1

- 104 -

1    participants in these markets. Thus, suppressing LIBOR would always, and obviously, tend to

2    suppress the rates of return on fixed-rate instruments by making lower rates of return relatively

3    more attractive. Defendants' suppression of LIBOR caused Plaintiffs to receive lower returns on

4    these obligations than they would have if LIBOR had been properly set. Plaintiffs relied on the

5    accuracy of LIBOR in undertaking these transactions, which was a foreseeable result of

6    Defendants' misconduct.

7        293.    The fixed-rate instruments affected by Defendants' misconduct include those (i)

8    issued or sold to Plaintiffs by Defendants, (ii) sold to Plaintiffs by subsidiaries or other affiliates

9    of Defendants, and (iii) issued or sold to Plaintiffs by third parties.

10       **B.    Plaintiffs Collectively Purchased Hundreds of Billions of Dollars in LIBOR-
             Based Financial Instruments that Paid Unduly Low Interest Rates.**
11

12       294.    During the Relevant Period, Plaintiffs purchased hundreds of billions of dollars in

13   LIBOR-based financial instruments impacted by Defendants' misconduct, including instruments

14   issued or sold by Defendants or sold by dealer entities that were subsidiaries of, or otherwise

15   affiliated with, Defendants, including, among others:  (i) Deutsche Bank Securities; (ii) Banc of

16   America Securities, LLC; (iii) Barclays Capital Inc.; (iv) Credit Suisse Securities (USA) LLC; (v)

17   UBS Financial Services Inc.; (vi) Citigroup Global Markets Inc.; (vii) Citigroup Funding, Inc.;

18   (viii) RBS Securities, Inc. (f/k/a Greenwich Capital Markets, Inc.); (ix) Bank of Scotland plc; (x)

19   JPMorgan Chase Bank, N.A.; (xi) J.P. Morgan Securities Inc. (f/k/a Bear Stearns & Co.); (xii) JP

20   Morgan Securities LLC; (xiii) HSBC Bank USA, N.A.; (xiv) HSBC Finance Corporation; (xv)

21   HSBC Securities (USA) Inc.

22       **1.    The Charles Schwab Corporation**

23       295.    During the Relevant Period, Plaintiff The Charles Schwab Corporation purchased

24   an aggregate of $466 million of floating-rate instruments, including discounted short-term

25   corporate and bank and financial institutions notes, that were affected by Defendants' suppression

26   of LIBOR.

27

28

1094456.1                                    - 105 -
                                          COMPLAINT

1

### 2.   Charles Schwab Bank, N.A.

2       296.   During the Relevant Period, Plaintiff The Charles Schwab Bank, N.A. purchased
3   an aggregate of $942 million of floating-rate instruments, including corporate debt and time
4   deposit certificates, that were affected by Defendants' suppression of LIBOR.  Of those, Plaintiff
5   purchased more than $128 million of instruments from Defendant JPMorgan Chase and
6   purchased more than $509 million of instruments from dealer entities that were subsidiaries or
7   other affiliates of Defendants.

8       297.   During the Relevant Period, Plaintiff The Charles Schwab Bank, N.A. purchased
9   an aggregate of $1 billion of fixed-rate instruments with a remaining maturity of between five and
10  365 days at the time of purchase, including bank time deposit certificates and mortgage
11  instruments, that were affected by Defendants' suppression of LIBOR.  Of those, Plaintiff
12  purchased more than $99 million of instruments from Defendant JPMorgan Chase and purchased
13  more than $225 million of instruments from dealer entities that were subsidiaries or other
14  affiliates of Defendants.

15

### 3.   Charles Schwab & Co., Inc.

16      298.   During the Relevant Period, Plaintiff Charles Schwab & Co., Inc. purchased an
17  aggregate of $35 million of floating-rate instruments, including corporate debt and time deposit
18  certificates, that were affected by Defendants' suppression of LIBOR.

19      299.   During the Relevant Period, Plaintiff Charles Schwab & Co., Inc. purchased an
20  aggregate of $28.4 billion of fixed-rate instruments with a remaining maturity of between five and
21  365 days at the time of purchase, including bank time deposit certificates, that were affected by
22  Defendants' suppression of LIBOR.  Of those, Plaintiff purchased more than $5.3 billion of
23  instruments from Defendant JPMorgan Chase and purchased more than $4 billion of instruments
24  from dealer entities that were subsidiaries or other affiliates of Defendants.

25

### 4.   Schwab Short-Term Bond Market Fund

26      300.   As of July 1, 2007, Plaintiff Schwab Short-Term Bond Market Fund held an
27  aggregate of $46 million of floating-rate instruments, including corporate debt and financial
28  institutions funding notes, affected by Defendants' suppression of LIBOR.

1094456.1                                    - 106 -

1      301.    During the Relevant Period, Plaintiff Schwab Short-Term Bond Market Fund

2   purchased an aggregate of $167 million of fixed-rate instruments with a remaining maturity of

3   between five and 365 days at the time of purchase, including corporate debt and financial

4   institutions funding debt, that were affected by Defendants' suppression of LIBOR. Of those,

5   Plaintiff purchased more than $57 million of instruments from Defendant JPMorgan Chase and

6   purchased more than $43 million of instruments from dealer entities that were subsidiaries or

7   other affiliates of Defendants.

8                   **5.    Schwab Total Bond Market Fund**

9      302.    As of July 1, 2007, Plaintiff Schwab Total Bond Market Fund held an aggregate of

10   $110 million of floating-rate instruments, including corporate debt and financial institutions

11   funding notes, affected by Defendants' suppression of LIBOR.

12     303.    During the Relevant Period, Plaintiff Schwab Total Bond Market Fund purchased

13   an aggregate of $3.5 billion of fixed-rate instruments with a remaining maturity of between five

14   and 365 days at the time of purchase, including corporate debt, bank funding notes financial

15   institutions funding debt, mortgage discount notes, mortgage loans, and other mortgage-related

16   instruments, that were affected by Defendants' suppression of LIBOR. Of those, Plaintiff

17   purchased more than $433 million of instruments from Defendant JPMorgan Chase and

18   purchased more than $1.8 billion of instruments from dealer entities that were subsidiaries or

19   other affiliates of Defendants.

20                  **6.    Schwab U.S. Dollar Liquid Assets Fund**

21     304.    During the Relevant Period, Plaintiff Schwab U.S. Dollar Liquid Assets Fund

22   purchased an aggregate of $95 million of floating-rate instruments, including bank and financial

23   institutions certificates of deposit, that were affected by Defendants' suppression of LIBOR.

24     305.    During the Relevant Period, Plaintiff Schwab Retirement Advantage Money Fund

25   purchased an aggregate of $5.4 billion of fixed-rate instruments with a remaining maturity of

26   between five and 365 days at the time of purchase, including bank certificates of deposit,

27   commercial paper and mortgage discount notes, that were affected by Defendants' suppression of

28   LIBOR.

### 7. **Schwab Money Market Fund**

306. During the Relevant Period, Plaintiff Schwab Money Market Fund purchased an aggregate of $1.4 billion of floating-rate instruments, including bank notes and debt, financial institutions funding notes, mortgage discount notes, mortgage loans, and other mortgage-related instruments, that were affected by Defendants' suppression of LIBOR. Of those, Plaintiff purchased $327 million of instruments from Defendant JPMorgan Chase and purchased $779 million of instruments from dealer entities that were subsidiaries or other affiliates of Defendants.

307. During the Relevant Period, Plaintiff Schwab Money Market Fund purchased an aggregate of $83.5 billion of fixed-rate instruments with a remaining maturity of between five and 365 days at the time of purchase, including bank and financial institutions funding notes and debt, mortgage discount notes, mortgage loans, and other mortgage-related instruments, that were affected by Defendants' suppression of LIBOR. Of those, Plaintiff purchased more than $20 billion of instruments from Defendants Citibank, Deutsche Bank, and JPMorgan Chase, collectively, and purchased more than $28 billion of instruments from dealer entities that were subsidiaries or other affiliates of Defendants.

### 8. **Schwab Value Advantage Money Fund**

308. During the Relevant Period, Plaintiff Schwab Value Advantage Money Fund purchased an aggregate of $4.56 billion of floating-rate instruments, including bank notes and debt, financial institutions funding notes, mortgage discount notes, mortgage loans, and other mortgage-related instruments, that were affected by Defendants' suppression of LIBOR. Of those, Plaintiff purchased $601 million of instruments from Defendant JPMorgan Chase and purchased more than $1.9 billion of instruments from dealer entities that were subsidiaries or other affiliates of Defendants.

309. During the Relevant Period, Plaintiff Schwab Value Advantage Money Fund purchased an aggregate of $288 billion of fixed-rate instruments with a remaining maturity of between five and 365 days at the time of purchase, including bank and financial institutions funding notes and debt, mortgage discount notes, mortgage loans, and other mortgage-related instruments, that were affected by Defendants' suppression of LIBOR. Of those, Plaintiff

1  purchased more than $73 billion of instruments from Defendants Citibank, Deutsche Bank, and

2  JPMorgan Chase, collectively, and purchased more than $91 billion of instruments from dealer

3  entities that were subsidiaries or other affiliates of Defendants.

4  **9.  Schwab Retirement Advantage Money Fund**

5  310.  During the Relevant Period, Plaintiff Schwab Retirement Advantage Money Fund

6  purchased an aggregate of $55 million of floating-rate instruments, including bank notes and debt,

7  corporate debt, financial institutions funding notes, mortgage discount notes, mortgage loans, and

8  other mortgage-related instruments, that were affected by Defendants' suppression of LIBOR. Of

9  those, Plaintiff purchased $19 million of instruments from Defendant JPMorgan Chase and

10  purchased $34 million of instruments from dealer entities that were subsidiaries or other affiliates

11  of Defendants.

12  311.  During the Relevant Period, Plaintiff Schwab Retirement Advantage Money Fund

13  purchased an aggregate of $4.7 billion of fixed-rate instruments with a remaining maturity of

14  between five and 365 days at the time of purchase, including bank and financial institutions

15  funding notes and debt, mortgage discount notes, mortgage loans, and other mortgage-related

16  instruments, that were affected by Defendants' suppression of LIBOR. Of those, Plaintiff

17  purchased more than $1 billion of instruments from Defendants Citibank, Deutsche Bank, and

18  JPMorgan Chase, collectively, and more than $1.5 billion of instruments from dealer entities that

19  were subsidiaries or other affiliates of Defendants.

20  **10.  Schwab Investor Money Fund**

21  312.  During the Relevant Period, Plaintiff Schwab Investor Money Fund purchased an

22  aggregate of $195 million of floating-rate instruments, including bank notes and debt, corporate

23  debt, financial institutions funding notes, mortgage discount notes, mortgage loans, and other

24  mortgage-related instruments, that were affected by Defendants' suppression of LIBOR. Of

25  those, Plaintiff purchased $42 million of instruments from Defendant JPMorgan Chase and

26  purchased $94 million of instruments from dealer entities that were subsidiaries or other affiliates

27  of Defendants.

28

1094456.1                                          - 109 -

1    313.    During the Relevant Period, Plaintiff Schwab Investor Money Fund purchased an

2    aggregate of $12 billion of fixed-rate instruments with a remaining maturity of between five and

3    365 days at the time of purchase, including bank and financial institutions funding notes and debt,

4    mortgage discount notes, mortgage loans, and other mortgage-related instruments, that were

5    affected by Defendants' suppression of LIBOR.  Of those, Plaintiff purchased more than $3

6    billion of instruments from Defendants Citibank, Deutsche Bank, and JPMorgan Chase,

7    collectively, and purchased more than $4 billion of instruments from dealer entities that were

8    subsidiaries or other affiliates of Defendants.

9              **11.    Schwab Cash Reserves**

10    314.    During the Relevant Period, Plaintiff Schwab Cash Reserves purchased an

11    aggregate of $2.59 billion of floating-rate instruments, including bank notes and debt, financial

12    institutions funding notes, mortgage discount notes, mortgage loans, and other mortgage-related

13    instruments, that were affected by Defendants' suppression of LIBOR.  Of those, Plaintiff

14    purchased $580 million of instruments from Defendant JPMorgan Chase and purchased more

15    than $1 billion of instruments from dealer entities that were subsidiaries or other affiliates of

16    Defendants.

17    315.    During the Relevant Period, Plaintiff Schwab Cash Reserves purchased an

18    aggregate of $146.7 billion of fixed-rate instruments with a remaining maturity of between five

19    and 365 days at the time of purchase, including bank and financial institutions funding notes and

20    debt, mortgage discount notes, mortgage loans, and other mortgage-related instruments, that were

21    affected by Defendants' suppression of LIBOR.  Of those, Plaintiff purchased more than $38

22    billion of instruments from Defendants Citibank, Deutsche Bank, and JPMorgan Chase,

23    collectively, and purchased more than $47 billion of instruments from dealer entities that were

24    subsidiaries or other affiliates of Defendants.

25              **12.    Schwab Advisor Cash Reserves**

26    316.    During the Relevant Period, Plaintiff Schwab Advisor Cash Reserves purchased an

27    aggregate of $2.2 billion of floating-rate instruments, including bank notes and debt, financial

28    institutions funding notes, mortgage discount notes, mortgage loans, and other mortgage-related

1094456.1                                      - 110 -

instruments, that were affected by Defendants' suppression of LIBOR.  Of those, Plaintiff purchased $106 million of instruments from Defendant JPMorgan Chase and purchased more than $1.4 billion of instruments from dealer entities that were subsidiaries or other affiliates of Defendants.

317.   During the Relevant Period, Plaintiff Schwab Advisor Cash Reserves purchased an aggregate of $116.5 billion of fixed-rate instruments with a remaining maturity of between five and 365 days at the time of purchase, including bank notes and debt, mortgage discount notes, mortgage loans, and other mortgage-related instruments, that were affected by Defendants' suppression of LIBOR.  Of those, Plaintiff purchased more than $29 billion of instruments from Defendants Citibank, Deutsche Bank, JPMorgan Chase, and UBS, collectively, and purchased more than $40 billion of instruments from dealer entities that were subsidiaries or other affiliates of Defendants.

### 13.   Schwab YieldPlus Fund

318.   As of July 1, 2007, Plaintiff Schwab YieldPlus Fund held an aggregate of $3.7 billion of floating-rate instruments, including corporate debt and bank and financial institutions funding notes, that were affected by Defendants' suppression of LIBOR during the Relevant Period.

319.   During the Relevant Period, Plaintiff purchased an aggregate of $13.6 billion of fixed-rate instruments with a remaining maturity of between five and 365 days at the time of purchase, including corporate debt, financial institutions funding debt, mortgage discount notes, mortgage loans, and other mortgage-related instruments, that were affected by Defendants' suppression of LIBOR.  Of those, Plaintiff purchased more than $5 billion of instruments from Defendant JPMorgan Chase and purchased more than $5.2 billion of instruments from dealer entities that were subsidiaries or other affiliates of Defendants.

### CIVIL CONSPIRACY

320.   As set forth above, Defendants, either expressly or tacitly, agreed to suppress LIBOR during the Relevant Period.

1    321.    Defendants each committed numerous acts in furtherance of that agreement,
2    including submitting false LIBOR quotes to the BBA throughout the Relevant Period and actively
3    concealing their misconduct, including by making false or misleading public statements
4    concerning LIBOR.

5    322.    Through their misconduct in artificially suppressing LIBOR during the Relevant
6    Period, Defendants defrauded Plaintiffs and other investors in LIBOR-based financial
7    instruments.

8    323.    Defendants' conspiracy harmed Plaintiffs by causing them to receive lower returns
9    on LIBOR-based financial instruments and/or to overpay for such instruments.

10   324.    Accordingly, each Defendant is being sued both individually as a primary violator
11   of the law, as stated in this Complaint, and as a co-conspirator.  As a co-conspirator, each
12   Defendant is jointly and severally liable for the fraud committed by its fellow Defendants.

13                    **TOLLING APPLIES TO PLAINTIFFS' CLAIMS**

14   325.    Plaintiffs' claims are subject to equitable tolling due to the fraudulent and
15   surreptitious nature of Defendants' misconduct, which Defendants intended to, and did, conceal
16   from Plaintiffs and other investors throughout the Relevant Period.  Accordingly, the "discovery
17   rule" applies to Plaintiffs' claims, as Plaintiffs did not discover, nor had reason to discover, the
18   causes of action set forth in this Complaint, until well after the Relevant Period.

19   326.    Furthermore, Defendants' misconduct constituted a "continuous violation" as
20   defined under the law, such that the limitations periods for Plaintiffs' claims did not accrue until
21   the date of the last wrong or injury that is the subject of this action.

22   327.    Plaintiffs' claims are also subject to tolling under the doctrine endorsed in
23   *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and its progeny, by virtue of
24   Plaintiffs' status as absent class members in the putative class actions included in the LIBOR
25   MDL Proceedings.  Accordingly, the statutes of limitations and repose applicable to Plaintiffs'
26   claims have been tolled as of the date the first putative class action encompassing the Schwab
27   Plaintiffs was filed in the LIBOR MDL Proceedings.

28

1094456.1                              - 112 -
                                       COMPLAINT

| | |
|---|---|
| 1 | 328. Additionally, as the Court presiding over the LIBOR MDL Proceedings, in |
| 2 | granting Defendants' motions to dismiss the Schwab Plaintiffs' claims by Order of March 29, |
| 3 | 2013, declined to exercise supplemental jurisdiction in accordance with 28 U.S.C. § 1367 over |
| 4 | the Schwab Plaintiffs' claims for interference with prospective economic advantage, breach of the |
| 5 | implied covenant of good faith and fair dealing, and unjust enrichment, the statutes of limitations |
| 6 | for those claims were tolled while they were pending in the LIBOR MDL Proceedings and |
| 7 | continued to be tolled for at least 30 days after the MDL court dismissed them without prejudice. |
| 8 | *See* 28 U.S.C. § 1367(d). |

9  **CLAIMS FOR RELIEF**

10  **(Against All Defendants)**

11  **FIRST CLAIM FOR RELIEF**

12  **Fraud, Deceit, and Concealment**

13  329. Plaintiffs incorporate by reference and reallege the preceding allegations as though
14  fully set forth herein.

15  330. Plaintiffs purchased LIBOR-based financial instruments issued by Defendants and
16  other entities. Those included floating-rate instruments where Defendants paid interest rates
17  expressly based on LIBOR and fixed-rate instruments where the parties determined the fixed rate
18  of interest by referencing LIBOR.

19  331. Defendants made numerous statements to Plaintiffs to induce them to purchase
20  those financial instruments.

21  332. Contemporaneous with Plaintiffs' purchases, Defendants gave public quotes to the
22  BBA of their supposed costs of borrowing.

23  333. In fact, Defendants' quotes to the BBA did not reflect their true costs of borrowing
24  but instead reflected Defendants' scheme to unlawfully manipulate LIBOR.

25  334. Defendants never disclosed to Plaintiffs the inaccuracy of their quotes to the BBA
26  or that Defendants had manipulated LIBOR to cause it to be lower than it should have been.

27  335. The inaccuracy of Defendants' reported quotes and their scheme to manipulate
28  LIBOR were material facts of which Plaintiffs were unaware. If Defendants had disclosed those

1094456.1                                    - 113 -

1     facts, Plaintiffs would not have purchased the subject financial instruments or at least would have

2     demanded appropriately higher interest rates on those instruments.  Plaintiffs relied on the

3     accuracy of Defendants' quotes, on the integrity and accuracy of LIBOR, and on the other

4     statements by Defendants that did not include these material omissions.

5           336.     Defendants' concealment of the inaccuracy of their reported quotes and their

6     scheme to manipulate LIBOR damaged Plaintiffs because Plaintiffs received lower returns (i.e.,

7     lower interest rates) than they would have had LIBOR been accurately and honestly set, or had

8     Plaintiffs purchased financial instruments not paying interest as a function of LIBOR.

9     **SECOND CLAIM FOR RELIEF**

10     **Violation of Section 17200 of the California Business and Professions Code**<br>**(Unfair Business Practices)**

11

12           337.     Plaintiffs incorporate by reference and reallege the preceding allegations as though
fully set forth herein.

13

14           338.     Defendants have engaged in fraudulent, unfair, and illegal conduct in violation of
Section 17200 of the California Business and Professions Code ("Section 17200").  Defendants'

15     conduct was substantially injurious to Plaintiffs.

16

17           339.     Defendants' business acts and practices, as alleged herein, constituted a continuous
course of unfair competition by means of unfair, unlawful, or fraudulent business acts or practices

18

19     in violation of Section 17200, including the following:

20             a.    the violations of federal and state securities laws and other laws as set forth in this
Complaint;

21

22             b.    Defendants' unfair and fraudulent business acts and practices, which induced

23                investors, including Plaintiffs, to purchase and retain the LIBOR-based financial

24                instruments Defendants or others issued based on falsely-set LIBOR rates, and

25                Defendants' materially false and misleading statements about their costs of

26                borrowing, made with knowledge or reckless disregard that they were materially

27                false or misleading when made.

28

1094456.1            - 114 -

340.   Defendants' misstatements and omissions alleged in this Complaint were material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making decisions concerning purchases of LIBOR-based financial instruments.

341.   Defendants' misstatements and omissions alleged in this Complaint are objectively material to the reasonable consumer, thus reliance upon such misstatements and omissions may be presumed as a matter of law.

342.   Defendants' business acts and practices, as alleged herein, have caused Plaintiffs to purchase and retain the subject LIBOR-based financial instruments and, as a result, to suffer losses.

343.   Plaintiffs are entitled to full relief, including full restitution or disgorgement of all revenues, earnings, profits, compensation, and benefits Defendants may have obtained as a result of such business, acts, or practices, and an injunction mandating that Defendants cease and desist from engaging in the practices described herein.

### THIRD CLAIM FOR RELIEF

#### Interference with Prospective Economic Advantage

344.   Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

345.   As set forth in this Complaint, Defendants manipulated LIBOR in violation of federal and state law.

346.   An economic relationship existed between Plaintiffs and issuers or sellers of LIBOR-based financial instruments, which obligated the issuers or sellers to make payments to Plaintiffs at a rate dependent on LIBOR.

347.   Defendants' unlawful manipulation of LIBOR interfered with and disrupted that relationship by defeating the parties' expectations that LIBOR would be set honestly and accurately and would provide a fair benchmark for those LIBOR-based financial instruments. As a result, Plaintiffs received lower payments on those instruments than they otherwise would have, and overpaid for the instruments, and were damaged thereby.

1    348.    Defendants acted with the knowledge that interference or disruption of Plaintiffs'

2   relationships with issuers or sellers of LIBOR-based financial instruments were certain or

3   substantially certain to result from Defendants' unlawful manipulation of LIBOR.

4                              **FOURTH CLAIM FOR RELIEF**

5                **Breach of the Implied Covenant of Good Faith and Fair Dealing**

6    349.    Plaintiffs incorporate by reference and reallege the preceding allegations as though

7   fully set forth herein.

8    350.    Plaintiffs contracted to purchase LIBOR-based financial instruments from

9   Defendants or dealer entities that were subsidiaries or other affiliates of Defendants.

10    351.    Plaintiffs performed all of their obligations under the applicable contracts.

11    352.    All conditions required for Defendants' performance of those contracts were

12   satisfied.

13    353.    Defendants unfairly interfered with Plaintiffs' right to receive the benefits of the

14   subject contracts by secretly manipulating LIBOR to be lower than it otherwise would have been,

15   as alleged in this Complaint.

16    354.    Plaintiffs received less interest and lower returns on the LIBOR-based financial

17   instruments than they would have absent Defendants' manipulation of LIBOR, and were therefore

18   harmed.

19                              **FIFTH CLAIM FOR RELIEF**

20                **Violation of Sections 25400 and 25401 of the California Corporations Code**

21    355.    Plaintiffs incorporate by reference and reallege the preceding allegations as though

22   fully set forth herein.

23    356.    Defendants, and each of them, acting individually or through a scheme and

24   conspiracy, directly and indirectly, induced Plaintiffs' purchase and retention of the subject

25   LIBOR-based financial instruments by circulating or disseminating, in or from California,

26   information for the purpose of inducing Plaintiffs to purchase and hold LIBOR-based financial

27   instruments. Defendants omitted to inform Plaintiffs that they were engaged in ongoing

28

1094456.1                              - 116 -

misconduct to suppress LIBOR that would cause any purchaser or holder of the subject LIBOR-based financial instruments to receive lower payments than it otherwise would.

357.    Defendants knew their statements were false or misleading in light of the circumstances under which they were made. Defendants intended that Plaintiffs would be misled and would purchase LIBOR-based financial instruments based on false information. Despite their knowledge, Defendants continued to make the misrepresentations to induce Plaintiffs to purchase LIBOR-based financial instruments.

358.    Defendants, and each of them, are liable under Sections 25500 and 25501 of the California Corporations Code for willfully participating in acts or transactions in violation of Sections 25400 and 25401 of the Corporations Code or for knowingly providing substantial assistance to violations of Sections 25400 and 25401 in violation of Section 25403. Defendants are therefore liable to Plaintiffs, who purchased LIBOR-based financial instruments at prices affected by Defendants' acts, for damages sustained as a result of such violations.

359.    Under Section 25504 of the California Corporations Code, Defendants, and each of them, are also liable as control persons, officers, principals, employees, broker-dealers, or agents who provided material aid to a person in violation of Section 25503.

360.    Plaintiffs are entitled to prejudgment interest at the legal rate on their economic damages.

## SIXTH CLAIM FOR RELIEF

### Rescission of Contract

361.    Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

362.    Plaintiffs purchased subject LIBOR-based financial instruments pursuant to contracts in writing between Plaintiffs and the dealers from which they purchased those financial instruments. Each contract stated the consideration Plaintiffs paid each dealer for each instrument.

363.    In making each contract to purchase subject LIBOR-based financial instruments, Plaintiffs relied on the truth of the statements Defendants made in the offering materials issued in

1    connection with the issuance and sale of those instruments. Because those statements were untrue

2    or misleading, Plaintiffs were mistaken about their basic assumptions underlying their purchases

3    of those instruments, and that mistake had a material adverse effect on the agreed-upon exchange

4    represented by Plaintiffs' purchase of each instrument.

5    364.    Because Defendants were responsible to provide accurate information in the

6    offering materials, Plaintiffs did not assume, nor do they bear, the risk of the fundamental mistake

7    underlying their decisions to purchase those instruments.

8    365.    Defendants obtained Plaintiffs' consents to the contracts to purchase the subject

9    LIBOR-based financial instruments by means of Defendants' assertion, as facts, of that which

10    was not true, when Defendants had no reasonable ground for believing those assertions were true.

11    366.    Plaintiffs are entitled to rescind, and do hereby demand the rescission of, each

12    contract for the sale and purchase of subject LIBOR-based financial instruments. Plaintiffs offer

13    to restore all benefits they have received under those contracts and are entitled to recover all

14    consideration paid under them.

15    <u>**SEVENTH CLAIM FOR RELIEF**</u>

16    <u>**Unjust Enrichment**</u>

17    367.    Plaintiffs incorporate by reference and reallege the preceding allegations as though

18    fully set forth herein.

19    368.    By means of their unlawful conduct set forth in this Complaint, including

20    misrepresenting their costs of borrowing to the BBA to manipulate LIBOR, Defendants

21    knowingly acted in an unfair, unconscionable, and oppressive manner toward Plaintiffs.

22    369.    Through their unlawful conduct, Defendants knowingly received and retained

23    wrongful benefits and funds from Plaintiffs. Defendants thereby acted with conscious disregard

24    for Plaintiffs' rights.

25    370.    As a result of their unlawful conduct, Defendants have realized substantial ill-

26    gotten gains. Defendants have unlawfully manipulated LIBOR at the expense of, and to the

27    detriment of, Plaintiffs, and to Defendants' benefit and enrichment.

28

1    371.    Plaintiffs' detriment and Defendants' enrichment are traceable to, and resulted

2    directly and proximately from, the conduct challenged in this Complaint.

3    372.    Under the common law doctrine of unjust enrichment, it is inequitable to permit

4    Defendants to retain the benefits they received, and are still receiving, without justification, from

5    their manipulation of LIBOR in an unfair, unconscionable, and oppressive manner. Defendants'

6    retention of such funds under circumstances making it inequitable to do so constitutes unjust

7    enrichment.

8    373.    The financial benefits Defendants derived rightfully belong to Plaintiffs. The

9    Court should compel Defendants to disgorge, in a common fund for Plaintiffs' benefit, all

10   unlawful or inequitable proceeds Defendants received. The Court should impose a constructive

11   trust upon all unlawful or inequitable sums Defendants received that are traceable to Plaintiffs.

12   374.    Plaintiffs have no adequate remedy at law.

13                                   **EIGHTH CLAIM FOR RELIEF**

14          **Violation of Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k**

15   375.    Plaintiffs incorporate by reference and reallege the preceding allegations as though

16   fully set forth herein.

17   376.    For purposes of this claim, Plaintiffs expressly disclaim and exclude any

18   allegations that could be construed as alleging fraud or intentional or reckless misconduct, as this

19   cause of action is based expressly on claims of strict liability or negligence under the Securities

20   Act.

21   377.    Plaintiffs bring this claim in connection with all LIBOR-based securities Plaintiffs

22   purchased in, or traceable to, offerings during the Relevant Period.

23   378.    Each Defendant filed registration statements and other related documents in

24   connection with each of the subject offerings.

25   379.    Those registration statements and other related documents contained materially

26   false statements of fact, or omitted to state facts necessary to make the statements therein not

27   misleading. Specifically, the documents omitted to state that Defendants, as set forth above, had

28   artificially suppressed LIBOR by providing inaccurate quotes to the BBA and that Defendants

1094456.1                                    - 119 -

1  perpetuated an ongoing scheme to continue their manipulation. Moreover, representations in the

2  subject registration statements and related documents that the interest rates for the subject

3  securities would be based on LIBOR were false or misleading as a result of Defendants'

4  manipulation of LIBOR. Thus references to "LIBOR" in those documents constitute affirmative

5  misstatements.

6      380. None of the Defendants made a reasonable investigation or possessed reasonable

7  grounds to believe that the statements contained in the registration statements were true or that

8  there was no omission of material facts necessary to make the statements made therein not

9  misleading.

10      381. By reason of the conduct herein alleged, each Defendant violated Section 11 of the

11  Securities Act.

12      382. As a direct and proximate result of Defendants' acts and omissions in violation of

13  the Securities Act, the prices or values of the securities sold in the subject offerings were

14  artificially inflated, and Plaintiffs suffered substantial damage in connection with their ownership

15  of those securities.

16      383. As issuers or underwriters of the subject securities, each Defendant is liable under

17  Section 11 to Plaintiffs for the material omissions identified above.

18      384. Plaintiffs obtained the subject securities without knowledge of the facts concerning

19  the misstatements or omissions alleged herein.

20      385. Plaintiffs are entitled to damages under Section 11 from each Defendant, as

21  measured by the provisions of Section 11(e).

22  **NINTH CLAIM FOR RELIEF**

23  **Violation of Section 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(2)**

24      386. Plaintiffs incorporate by reference and reallege the preceding allegations as though

25  fully set forth herein.

26      387. For purposes of this claim, Plaintiffs expressly disclaim and exclude any

27  allegations that could be construed as alleging fraud or intentional or reckless misconduct, as this

28

1  cause of action is based expressly on claims of strict liability or negligence under the Securities
2  Act.

3  388. Defendants were sellers, offerors, underwriters, or solicitors of sales of securities
4  issued through prospectuses or oral communications during the Relevant Period.

5  389. The prospectuses or oral communications contained untrue statements of material
6  facts, omitted to state other facts necessary to make the statements made not misleading, and
7  concealed and failed to disclose material facts. Defendants' actions of solicitation included
8  participating in the preparation of the false and misleading prospectuses or oral communications.

9  390. Defendants owed to the purchasers of the subject securities, including Plaintiffs,
10  the duty to make a reasonable and diligent investigation of the statements contained in the
11  prospectuses or oral communications, to insure that such statements were true and that there was
12  no omission to state a material fact required to be stated in order to make the statements contained
13  therein not misleading. Defendants knew of, or in the exercise of reasonable care should have
14  known of, the misstatements and omissions contained in the prospectuses or oral
15  communications, as set forth above.

16  391. Plaintiffs purchased or otherwise acquired securities pursuant to or traceable to the
17  defective prospectuses or oral communications. Plaintiffs did not know, nor in the exercise of
18  reasonable diligence could have known, of the untruths and omissions.

19  392. Plaintiffs hereby offer to tender to Defendants those securities Plaintiffs continue
20  to own, in return for the considerations paid for those securities, together with interest thereon.

21  393. By reason of the conduct alleged herein, Defendants violated, or controlled a
22  person who violated, Section 12(a)(2) of the Securities Act. Accordingly, Plaintiffs have the right
23  to rescind and recover the consideration paid for the subject securities and hereby elect to rescind
24  and tender those securities to Defendants. Plaintiffs are entitled to rescissionary damages with
25  respect to those subject securities they have sold.

26
27
28

1094456.1                                    - 121 -

**TENTH CLAIM FOR RELIEF**

**Violation of Section 15 of the Securities Act of 1933, 15 U.S.C. § 77o**

394.    Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

395.    This cause of action is being brought under Section 15 of the Securities Act, 15 U.S.C. §77o, against Defendants. This Count is based solely on strict liability and negligence, and does not sound in fraud. Any allegations of fraud or fraudulent conduct or motive are specifically excluded. For purposes of asserting this and its other claims under the Securities Act, Plaintiffs do not allege that Defendants acted with intentional, reckless, or otherwise fraudulent intent.

396.    Each of the Defendants, by virtue of its position as a parent company or otherwise controlling entity of one or more entities that issued or sold LIBOR-based securities to Plaintiffs and other investors during the Relevant Period, was a control person of those entities.

397.    As a result, Defendants are liable under Section 15 of the Securities Act for those securities dealers' primary violations of Sections 11 or 12(a)(2) of the Securities Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

(A)    That the Court enter an order declaring that Defendants' actions as set forth in this Complaint, and in other respects, violate the law;

(B)    That the Court enter judgment awarding Plaintiffs damages against Defendants for all economic, monetary, actual, consequential, and compensatory damages Plaintiffs suffered as a result of Defendants' conduct, or rescission, together with pre- and post-judgment interest at the maximum rate allowable by law;

(C)    That the Court award Plaintiffs exemplary or punitive damages against Defendants to the extent allowable by law;

(D)    That the Court order the disgorgement of the ill-gotten gains Defendants derived from their misconduct;

(E)    That the Court award Plaintiffs restitution of all amounts they paid to Defendants

1    as consideration for financial instruments affected by Defendants' misconduct;

2        (F)      That the Court issue an injunction prohibiting Defendants from engaging in the

3    misconduct alleged in this Complaint;

4        (G)      That the Court award Plaintiffs their costs of suit, including reasonable attorneys'

5    fees and expenses; and

6        (H)      That the Court award such other and further relief as the Court may deem just and

7    proper.

8

9    Dated: April 29, 2013            LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

10

11                                By:
                                Richard M. Heimann (State Bar No. 065200) 63607

12                                 Eric B. Fastiff (State Bar No. 182260)
                                Brendan P. Glackin (State Bar No. 199643)

13                                 Marc A. Pilotin (State Bar No. 266369)
                                LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

14                                 275 Battery Street, 29th Floor
                                San Francisco, CA 94111-3339

15                                 Telephone: (415) 956-1000
                                Facsimile: (415) 956-1008

16                                 E-mail: rheimann@lchb.com
                                  efastiff@lchb.com

17                                   bglackin@lchb.com
                                  mpilotin@lchb.com

18

19                                 Steven E. Fineman (State Bar No. 140335)
                                Michael J. Miarmi

20                                 LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
                                250 Hudson Street, 8th Floor

21                                 New York, NY 10013-1413
                                Telephone: (212) 355-9500

22                                 Facsimile: (212) 355-9592
                                E-mail: sfineman@lchb.com

23                                   mmiarmi@lchb.com

24

25

26

27

28

   1094456.1                               - 123 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Lowell Haky (State Bar No. 178526)
*Vice President and Associate General Counsel*
THE CHARLES SCHWAB CORPORATION
211 Main Street
San Francisco, CA 94105
Telephone: (415) 667-0622
Facsimile: (415) 667-1638
E-mail: Lowell.Haky@schwab.com

*Attorneys for Plaintiffs*

1

## DEMAND FOR JURY TRIAL

2        Plaintiffs hereby demand a trial by jury of all issues so triable.

3

4    Dated: April 29, 2013                LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

5

6                                         By:
                                          Richard M. Heimann (State Bar No. 065200) 63607
7                                         Eric B. Fastiff (State Bar No. 182260)
                                          Brendan P. Glackin (State Bar No. 199643)
8                                         Marc A. Pilotin (State Bar No. 266369)
                                          LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
9                                         275 Battery Street, 29th Floor
                                          San Francisco, CA 94111-3339
10                                        Telephone: (415) 956-1000
                                          Facsimile: (415) 956-1008
11                                        E-mail: rheimann@lchb.com
                                                   efastiff@lchb.com
12                                                 bglackin@lchb.com
                                                   mpilotin@lchb.com
13
                                          Steven E. Fineman (State Bar No. 140335)
14                                        Michael J. Miarmi
                                          LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
15                                        250 Hudson Street, 8th Floor
                                          New York, NY 10013-1413
16                                        Telephone: (212) 355-9500
                                          Facsimile: (212) 355-9592
17                                        E-mail: sfineman@lchb.com
                                                   mmiarmi@lchb.com
18
                                          Lowell Haky (State Bar No. 178526)
19                                        *Vice President and Associate General Counsel*
                                          THE CHARLES SCHWAB CORPORATION
20                                        211 Main Street
                                          San Francisco, CA 94105
21                                        Telephone: (415) 667-0622
                                          Facsimile: (415) 667-1638
22                                        E-mail: Lowell.Haky@schwab.com
23

24
                                          *Attorneys for Plaintiffs*
25

26

27

28

1094456.1                          - 125 -
                                  COMPLAINT

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

Richard M. Heimann (State Bar No. 063607)
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
  TELEPHONE NO.: 415-956-1000    FAX NO.: 415-956-1008
ATTORNEY FOR *(Name):* Plaintiffs

**F I L E D**
San Francisco County Superior Court

APR 2 9 2013

CLERK OF THE COURT
BY: _____ **DENNIS TOYAMA**
                          Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
  STREET ADDRESS: 400 McAllister Street
  MAILING ADDRESS:
  CITY AND ZIP CODE: San Francisco, CA 94102
  BRANCH NAME: Civic Center Courthouse

CASE NAME:
Charles Schwab Bank, N.A., et al. v. Bank of America Corporation, et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| ☑ Unlimited    ☐ Limited<br>(Amount       (Amount<br>demanded    demanded is<br>exceeds $25,000)  $25,000 or less) | ☐ Counter    ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | C G C - 1 3 - 5 3 1 0 1 6<br>JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☑ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☑ is    ☐ is not    complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
 a. ☑ Large number of separately represented parties
 b. ☑ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
 c. ☑ Substantial amount of documentary evidence
 d. ☑ Large number of witnesses
 e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
 f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☑ monetary    b. ☐ nonmonetary; declaratory or injunctive relief    c. ☑ punitive
4. Number of causes of action *(specify):* Ten (10)
5. This case ☐ is    ☑ is not    a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date:
Richard M. Heimann
        (TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
• Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]          **CIVIL CASE COVER SHEET**          Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov